## MARTIN B. MILLER *et al.*

*v.*

## JEREMIAH GOODWIN *et al.*

1. EVIDENCE—*journal entries of the two houses of the legislature.* A transcript from the journal record of either house of the legislature, of its proceedings, properly certified, is admissible in evidence to prove the facts therein recorded. It is not necessary to produce the original minutes made by the officers of the respective houses, or copies thereof.

2. SAME—*journals not required to be signed.* The law does not require that the officers of the General Assembly shall sign the record of the proceedings of either house, or that the copying clerks shall certify to the accuracy of their work, in order to make the same admissible as evidence.

3. MUNICIPAL CORPORATIONS—*contracts, without authority of law, void.* Contracts of public corporations, made through their officers without

authority of law, are void, and in an action upon them, the corporation may successfully interpose the plea of *ultra vires*, setting up as a defense its own want of power under its charter, or constituent statute, to enter into the contract.

APPEAL from the Circuit Court of Kane county; the Hon. SILVANUS WILCOX, Judge, presiding.

This was a bill in chancery, filed by Jeremiah Goodwin and a number of other tax-payers of Aurora township, in Kane county, against Martin B. Miller, collector of that township, and Henry C. Paddock, county treasurer of Kane county, to restrain the collection of a tax levied to pay interest and a portion of the principal of $10,000 in bonds, issued by the town of Aurora on a subscription to the capital stock of the Ottawa, Oswego and Fox River Valley Railroad Company. The opinion of the court states the grounds upon which the relief was granted.

Messrs. ELDRIDGE & LEWIS, and Mr. B. F. PARKS, for the appellants.

Mr. S. W. BROWN, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

In *Ryan* v. *Lynch et al.* 68 Ill. 160, we held, on the evidence then before us, that the purported act entitled "An act authorizing certain cities, counties, incorporated towns and townships, to subscribe to the stock of certain railroads," approved February 18, 1857, (Public Laws of 1857, p. 225,) was not passed by the Senate in conformity with section 2, article 3, of the constitution of 1848, and was, therefore, not a law. The evidence upon which we came to that conclusion was, a transcript of the Senate journal, certified by the Secretary of State, in proper form. The same evidence is before us in the present case, but there is also evidence introduced by appellants for the purpose of impeaching this transcript,

now before us, and our first inquiry must be as to the effect of that evidence.

It is shown, by the evidence, that the minutes of the proceedings of the General Assembly of 1857 were taken down by the proper officers of the respective houses, on sheets composed of blanks, prepared for conveniently taking the "ayes" and "noes," on "cap" paper, which were fastened together at the end of each day's proceedings, and subsequently deposited with the Secretary of State. These the Secretary caused to be copied, in regular and proper order, in a bound volume prepared and kept in his office for that purpose, which was called "the journal record." When the minutes were thus copied, they were sent to the public printer, and they were never returned. The transcript in evidence is of "the journal record," in the Secretary's office, and not of the original minutes prepared by the officers of the General Assembly. It is insisted that the transcript of the minutes alone, is admissible as evidence.

The provision in the constitution of 1848, requiring each house to keep and publish a journal of its proceedings, is precisely the same as that of the constitution of 1818. The constitutional mandate is simply that, "each house shall keep a journal of its proceedings, and publish the same." The requirement, that any evidence of such journal shall be kept in the office of the Secretary of State, as well as when and how evidence of the same, admissible in courts of justice, shall be obtained, is merely a statutory regulation.

It was provided, by section 3, chapter 84, Rev. Stats. of 1845, that the journal of each house of the General Assembly *shall be kept* in well bound books; and, by sections 5 and 8, chapter 96, of the same statutes, they were required to be deposited with the Secretary of State.

By section 3 of "An act to provide for copying and distributing the laws and journals, and for other purposes," in force February 12, 1849, (Laws of 1849, p. 95,) the Secretary of State is required, within thirty days previous to the meet-

ing of any future General Assembly, to advertise for proposals for copying the laws, joint resolutions and journals of the General Assembly. And, by section 4 of the same act, he is required to furnish a well bound book, in which the journals shall be copied. These sections are *in pari materia* with the preceding sections referred to of the Revised Statutes of 1845, and they must be construed together. It is obviously impracticable to record the proceedings of each house, as they transpire, in "well bound volumes," as must have been well known to the members of the legislature; yet the journals must thus be kept, and it is certainly impossible that the journals shall be copied in a well bound book, unless there is something to copy from. Plainly, then, the current minutes, taken by the clerks and secretaries, and their assistants, in the respective houses, were not understood to be "journal records," but minutes merely, as they were, in fact, to be transcribed into such records. Of necessity, the minutes could not be in a convenient and permanent form for preservation, and they were, therefore, required to be copied into a record in which they could be preserved. This view is greatly strengthened by the fact that there is no other possible motive which we can conceive for requiring the journals to be copied into a bound record. Public information of the proceedings is required to be furnished by publication, and if this record is not designed to be a permanent depository of the evidence of the proceedings required to be copied into it, then we must presume that the law requires the making and preservation of a public record, with no end in view. This is not admissible.

It is a sufficient answer to the objections urged, that the officers of the General Assembly have not signed the record, and that the copying clerks have not certified to the accuracy of their work, that these things are not required by the law. It is presumed that a record, made pursuant to law, is accurate, until the contrary is successfully established. Deed records and records of the proceedings of courts, contain no certificates by the clerks by whom they are made, appended

either at the close of the volumes or elsewhere, that they are accurately and truly made, and we have never yet heard that copies of them might not be read in evidence, in proper cases, on account of this omission.    The guaranty of accuracy and fidelity, in all such cases, is found in the obligations of official duty.

We are of opinion, then, that the transcript in evidence was of the proper record, and that it is conclusive against the validity of the pretended act of February 18, 1857, before referred to.

In no other respect than the one just noticed, does the present case materially differ from that of *Ryan* v. *Lynch et al. supra,* and we deem it necessary to add but little to what we said in that case.    We there said :  " The bill      *      * never became a law, and the pretended act conferred no power.      *      *      *      It follows that the bonds were not merely voidable, but that they were absolutely void for want of power or authority to issue them, and, consequently, no subsequent act or recognition of their validity could so far give vitality to them as to estop the tax-payers from denying their legality."    To this, we add the following quotation from Dillon on Municipal Corporations, section 381 :   " The general principle of law is settled, beyond controversy, that the agents, officers, or even city council, of a municipal corporaation, *can not bind the corporation* by any contract which is beyond the scope of its powers, or entirely foreign to the purposes of the corporation, or which (not being, in terms, authorized,) is against public policy.    This doctrine grows out of the nature of such institutions, and rests upon reasonable and solid ground.    The inhabitants are the corporators—the officers are but the public agents of the corporation.    Their duties and powers are prescribed by statute or charter, which all persons not only may know, but are bound to know.    The opposite doctrine would be fraught with such danger, and accompanied with such abuse, that it would soon end in the ruin of municipalities, or be legislatively overthrown.    These

considerations vindicate both the reasonableness and necessity of the rule, that the corporation is bound only when its agents or officers, by whom alone it can act, if it acts at all, keep within the limits of the chartered authority of the corporation.        *     *     *     It results from this doctrine, that unauthorized contracts are void, and, in actions thereon, the corporation may successfully interpose the plea of *ultra vires,* setting up, as a defense, its own want of power, under its charter or constituent statute, to enter into the contract." See, also, sections 749, 767, and notes.

The decree of the court below will be affirmed.

*Decree affirmed.*