## Town of South Ottawa *v.* Perkins.

## Supervisors of Kendall County *v.* Post.

1. The Supreme Court of Illinois, by a long course of decisions, has held that, under the Constitution of 1848, a statute of that State is not valid unless the legislative journals show that it was passed by a majority of all the members elect in each house of the general assembly.

2. Except where the Federal Constitution and laws are concerned, the courts of the United States, in passing upon the Constitution and statutes of a State, conform to the settled construction of them by the highest State court;

and, when the latter holds a pretended act of the legislature to be void and not a law, the courts of the United States are bound to hold accordingly.

3. Any State may, by its Constitution and laws, prescribe what shall be conclusive evidence of its statutes; but, on general principles, the question as to the existence or non-existence of a statute is a judicial one, and, though framed in form as an issue in fact, must, when it arises in the courts of the United States, be decided by them, on evidence legally applicable under the laws of the State, without taking the advice of a jury on the subject.

4. A municipal corporation cannot, without legislative authority, issue bonds in aid of an extraneous object. Every person dealing in them must, at his peril, take notice of the existence and terms of the law which, it is claimed, conferred the power to issue them, no matter under what circumstances he may obtain them.

5. The plaintiffs in error, municipal corporations in Illinois, having issued the bonds in suit, by virtue of a pretended act of the general assembly, approved Feb. 18, 1857, which was duly published among the printed statutes of that State as a law, and, therefore, *primâ facie* valid, were not estopped from denying its passage, notwithstanding the holder of the bonds was a *bona fide* purchaser without actual notice.

6. The Supreme Court of Illinois has decided, in two cases, that that act was never passed, and is not an act of the legislature of that State. This court concurs in that view, and also holds that no subsequent legislation has given any new force to the act, or any validity to the bonds issued, or the proceedings had, under it.

7. The act of Congress, prescribing the mode in which the public acts, records, and judicial proceedings in each State shall be authenticated, so as to take effect in every other State, has no bearing upon this case.

ERROR to the Circuit Court of the United States for the Northern District of Illinois.

The facts are stated in the opinion of the court.

Argued by *Mr. P. Phillips* and *Mr. T. Lyle Dickey* for the plaintiffs in error, by *Mr. G. S. Eldridge* for Perkins, and by *Mr. D. T. Littler* and *Mr. H. Greene* for Post.

MR. JUSTICE BRADLEY delivered the opinion of the court.

The first of these actions was brought by Perkins, the plaintiff below, to recover the amount due upon two negotiable bonds of the town of South Ottawa, in the usual form, for $1,000 each, made payable to the Ottawa, Oswego, and Fox River Valley Railroad Company, or bearer, in three years from July 1, 1869, with coupons for the semi-annual payment of interest attached. They each contained recitals as follows:—

" This bond is one of a series of twenty bonds, bearing even date herewith, each for the sum of $1,000, . . . and is issued in pursu-

ance of an election held in said town, on the eighth day of October, 1866, under and by virtue of a certain act of the legislature of the State of Illinois, approved Feb. 18, 1857, entitled 'An Act authorizing certain cities, counties, incorporated towns and townships to subscribe to the stock of certain railroads,' . . . at which election a majority of the legal voters participating in the same voted 'for subscription' to the capital stock of said railroad in the sum of $20,000, and to issue the bonds of said town therefor; and the said election was by the proper authorities duly declared carried 'for subscription,' previous application having been made to the town-clerk of the town, and said clerk having called said election in accordance therewith, and having given due notice of the time and place of holding the same, as required by law and the act aforesaid."

The second action was brought on a bond issued by the county of Kendall, in Illinois, bearing date the fourth day of May, 1869, in aid of the same railroad, and by virtue of the same act of the legislature, and containing substantially the same recitals, *mutatis mutandis*, as those in the Ottawa bonds, except that the election authorizing the issue of the bonds is stated to have been held on the thirtieth day of March, 1869. The facts in the two cases are, in other respects, substantially the same.

The only authority claimed for issuing these bonds is the act referred to in the above recital therein. If no such act was ever passed by the legislature of Illinois, the bonds are void. A municipal corporation cannot issue bonds in aid of extraneous objects without legislative authority, of which all persons dealing with such bonds must take notice at their peril. *Pendleton County* v. *Amy*, 13 Wall. 297; *Kenicott* v. *The Supervisors*, 16 id. 452; *St. Joseph Township* v. *Rogers*, 16 id. 644; *Town of Coloma* v. *Eaves*, 92 U. S. 484.

It is insisted on the part of the plaintiffs in error in these cases that the law relied on for authority to issue the bonds in question was never passed, no entry of its passage appearing on the journal of the Senate of Illinois.

The Constitution of Illinois, adopted in 1848, contains the following provisions: —

" ART. 3, SECT. 1. The legislative authority of the State shall be vested in a general assembly, which shall consist of a senate and house of representatives, both to be elected by the people."

" SECT. 3. Each house shall keep a journal of its proceedings, and publish them. . . . "

" SECT. 21. . . . On the final passage of all bills, the vote shall be by ayes and noes, and shall be entered on the journal ; and no bill shall become a law without the concurrence of a majority of all the members elect in each house."

The Constitution also provides that all bills passed shall be signed by the speakers of the two houses, and approved and signed by the governor, or, in case of his refusal, shall be re-passed by a majority elected to each house. The general laws of the State provide for depositing all acts of the legislature, and the original journals of the two houses, in the office of the Secretary of State, who is charged with having them printed; and the printed statute-books are made evidence of the acts contained therein.

In the construction of the constitutional provisions above recited, the Supreme Court of Illinois, by a long course of decisions, has held that it is necessary to the validity of a statute that it should appear by the legislative journals that it was duly passed in the manner required by the Constitution.

As early as 1853, it was decided, in *Spangler* v. *Jacoby*, 14 Ill. 297, that it was " competent to show from the journals of either branch of the legislature that a particular act was not passed in the mode prescribed by the Constitution, and thus defeat its operation altogether. The Constitution requires each house to keep a journal, and declares that certain facts, made essential to the passage of a law, shall be stated therein. If those facts are not set forth, the conclusion is that they did not transpire. The journal is made up under the immediate direction of the house, and is presumed to contain a full and complete history of its proceedings. If a certain act received the constitutional assent of the body, it will so appear on the face of its journal. And when a contest arises as to whether the act was passed, the journal may be appealed to to settle it. It is the evidence of the action of the house, and by it the act must stand or fall. 'It certainly was not the intention of the framers of the Constitution that the signatures of the speakers and the executive should furnish conclusive evidence of the pas-

sage of a law. The presumption, indeed, is, that an act thus verified became the law, pursuant to the requirements of the Constitution; but that presumption may be overthrown. If the journal is lost or destroyed, the presumption will sustain the law, for it will be intended that the proper entry was made on the journal. But when the journal is in existence, and it fails to show that the act was passed in the mode prescribed by the Constitution, the presumption is overcome, and the act must fall."

This case was followed, in 1855, by *Turley* v. *County of Logan*, 17 id. 151. There, a law was supposed to have been passed at the session of the legislature in 1853, for the removal of the seat of justice of Logan County, by a vote of the people. In the fall after, a vote was taken, which resulted in favor of the removal. Turley and his associates then filed their bill to restrain the county officers from erecting county buildings at the new location, on the ground that, as appeared by the journal, the act had not been read in the House of Representatives the full number of times required by the Constitution, and so was no law. The fact being as alleged, the injunction was, in the first instance, allowed, but afterwards, in February, 1854, the same legislature met in extra session, and, on recollection of members, and by the manuscript notes of the clerk, the House of Representatives amended its journal so that it showed the bill had been read the requisite number of times. Thereupon the Supreme Court, when the case came there, while recognizing fully the authority of *Spangler* v. *Jacoby*, affirmed a decree dissolving the injunction and dismissing the bill, for the reason that it was within "the power of the same legislature, at the same or a subsequent session, to correct its own journals, by amendments which show the true facts as they actually occurred."

The same question was also considered by the same court in *Prescott* v. *The Trustees of the Illinois & Michigan Canal*, 19 id. 324, decided in 1857. There, Prescott and Arnold were entitled to purchase, at the appraised value, certain lots in Chicago, which had been appraised twice; and the point to be decided was, whether they should pay according to the first or second appraisal. The second appraisal was made under a

law supposed to have been passed Feb. 14, 1851, but which the journals showed had never in fact passed either branch of the general assembly. Accordingly, the court held, upon the authority of *Spangler* v. *Jacoby*, that the second appraisal was invalid, and that the parties had the right to purchase under the first.

In the case of *The Supervisors of Schuyler County* v. *The People*, 25 id. 181, which came before the court in 1860, it was objected that the Senate journal did not show that the bill incorporating the railroad company was read three times in that body before it was put on its final passage; but the court, while still approving *Spangler* v. *Jacoby*, held that the Constitution did not require the fact that the bill had been read three times to be entered on the journals, and, consequently, that the validity of the law could not be impeached on that ground.

In 1864, in the case of *The People ex rel. Barnes* v. *Starne*, 35 id. 121, an application was made for a *mandamus* to compel the treasurer of the State to countersign, register, and pay a warrant issued upon him in favor of Barnes, the relator, by the auditor of public accounts. The warrant was issued upon the authority of what was supposed to be a statute of Illinois, approved Feb. 14, 1863, as compensation for transporting and bringing home certain wounded soldiers belonging to the State; but it being shown that the journal of the House of Representatives did not contain entries to the effect that the bill was passed by a majority of the members elect, or that the vote was taken by ayes and noes upon the final passage, the *mandamus* was refused. In the opinion of the court the authorities are extensively reviewed, and the rulings in the previous cases reaffirmed.

These cases were all decided before the issue of the bonds sued on in this case. But since that time two cases have arisen under the very law now in question, in which the Supreme Court of Illinois has decided that it was never passed, and is not an act of the legislature of that State. The first of these cases *Ryan* v. *Lynch*, 68 id. 160, was decided in 1873. Certain tax-payers of the town of Ottawa sought to enjoin the tax-collector from collecting a tax which had been levied to pay interest upon bonds issued in aid of the Ottawa, Oswego,

and Fox River Railroad Company, upon the ground that the act under which the bonds were issued, that of Feb. 18, 1857 (the same which is now under consideration), had not been enacted in conformity with the requirements of the Constitution. At the hearing in the court below it was proved that the journal of the Senate did not show that the bill had ever passed that body. Upon this proof, the court, recognizing the authority of *Spangler* v. *Jacoby* and other cases which followed it, granted the injunction asked for. In the Supreme Court, on appeal, it was insisted that the decree ought to be reversed, because the bondholders had not been made parties. The objection was overruled, and the action of the court below affirmed.

Following this is the case of *Miller & Paddock* v. *Goodwin*, 7 Chicago Legal News, 294, not yet reported in the regular series of the reports of the State. It being shown in this case, as in *Ryan* v. *Lynch*, that the journals did not contain the requisite evidence of the passage of the law, it was again adjudged invalid. This was in January, 1875. An effort was made in this last case to impeach the transcript of the legislative journals; but it was unsuccessful. The court repeated what it had said in the case of *Ryan* v. *Lynch*, using this language: " The bill never became a law, and the pretended act conferred no power. It follows that the bonds were not merely voidable, but that they were absolutely void, for want of power or authority to issue them; and consequently no subsequent act or recognition of their validity could so far give vitality to them as to estop the tax-payers from denying their legality." This opinion, it is true, was delivered after the trial of the case now before us. But it goes to show that, up to the very moment of that trial, there had been no vacillation in the State court as to the construction and effect of the Constitution of Illinois.

When the cases now under consideration came on for trial in May, 1874, the defendants below offered to prove, by the journals of each house of the legislature, that there was no entry in the same of the passage by the Senate of the act of Feb. 18, 1857. The testimony was objected to, and ruled out. Substantially the same questions were raised by demurrer to a plea. The ground of this decision seems to have been, that

the holder of the bonds was a *bona fide* purchaser of them without notice of any objection to their validity; that the first instalment of interest was paid at maturity; and, therefore, that the defendant was estopped from offering any evidence to show that the act was not passed, the same having been duly published among the printed statutes as a law, and being therefore *prima facie* a valid law: in other words, that although the act might not have been duly passed, the town, under the circumstances of the case, was estopped from denying its passage.

We cannot assent to this view. There can be no estoppel in the way of ascertaining the existence of a law. That which purports to be a law of a State is a law, or it is not a law, according as the truth of the fact may be, and not according to the shifting circumstances of parties. It would be an intolerable state of things if a document purporting to be an act of the legislature could thus be a law in one case and for one party, and not a law in another case and for another party; a law to-day, and not a law to-morrow; a law in one place, and not a law in another in the same State. And whether it be a law, or not a law, is a judicial question, to be settled and determined by the courts and judges. The doctrine of estoppel is totally inadmissible in the case. It would be a very unseemly state of things, after the courts of Illinois have determined that a pretended statute of that State is not such, having never been constitutionally passed, for the courts of the United States, with the same evidence before them, to hold otherwise.

It is declared by the Judiciary Act as a fundamental principle "that the laws of the several States, except where the Constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply." Sect. 34. And this court has always held that the laws of the States are to receive their authoritative construction from the State courts, except where the Federal Constitution and laws are concerned; and the State Constitutions, in like manner, are to be construed as the State courts construe them. This has been so often laid down as the proper rule, and is in itself so obviously correct, that it is unnecessary to refer to the authorities.

If, therefore, the law in question had never been passed upon by the State courts, the courts of the United States would nevertheless be bound to give to the Constitution of Illinois the same construction which the State courts give to it, and to hold a pretended act of the legislature void and not a law which the State courts would hold to be so. Otherwise, we should have the strange spectacle of two different tribunals, having co-ordinate jurisdiction in the same State, differing as to the validity and existence of a statute of that State, without any power to arbitrate between them. In speaking, however, of their jurisdiction as being co-ordinate, it is only meant that one has no power to enforce its decisions upon the other. As a matter of propriety and right, the decision of the State courts on the question as to what are the laws of the State is binding upon those of the United States.

But the law under consideration has been passed upon by the Supreme Court of Illinois, and held to be invalid. This ought to have been sufficient to have governed the action of the court below. In our judgment it was not necessary to have raised an issue on the subject, except by demurrer to the declaration. The court is bound to know the law without taking the advice of a jury on the subject. When once it became the settled construction of the Constitution of Illinois that no act can be deemed a valid law, unless, by the journals of the legislature, it appears to have been regularly passed by both houses, it became the duty of the courts to take judicial notice of the journal entries in that regard. The courts of Illinois may decline to take that trouble, unless parties bring the matter to their attention; but, on general principles, the question as to the existence of a law is a judicial one, and must be so regarded by the courts of the United States.

This subject was fully discussed in *Gardner* v. *The Collector.* After examining the authorities, the court in that case lays down this general conclusion, " that whenever a question arises in a court of law of the existence of a statute, or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory

answer to such question; always seeking first for that which in its nature is most appropriate, unless the positive law has enacted a different rule." 6 Wall. 511.

Of course, any particular State may, by its Constitution and laws, prescribe what shall be conclusive evidence of the existence or non-existence of a statute; but, the question of such existence or non-existence being a judicial one in its nature, the mode of ascertaining and using that evidence must rest in the sound discretion of the court on which the duty in any particular case is imposed.

Not only the courts, but individuals, are bound to know the law, and cannot be received to plead ignorance of it. The holder of the bonds in question can claim no indulgence on that score, and can take no advantage from the allegation that he is a *bona fide* purchaser without notice. He would, it is true, be precluded from doing so on another ground; namely, the want of any legislative authority in fact in the town to issue the bonds in question. Want of such authority is a fatal objection to their validity, no matter under what circumstances the holder may have obtained them.

Thus far we have not adverted to the argument attempted to be drawn by the defendants in error from the fact that the act in question was referred to in two subsequent acts of the legislature as an existing law. One of these was passed on the twenty-seventh day of March, 1869, entitled "An Act to amend an act, entitled 'An Act to incorporate the Ottawa, Oswego, and Fox River Valley Railroad Company.'" This act authorized the company to build a railroad from the town of Wenona to the city of Peoria; and, by the second section, it was enacted "that any city, county, town, or township near to or through which said road is now or may hereafter be located is hereby authorized to subscribe to the capital stock of said railroad, upon the terms and conditions prescribed in an act entitled 'An Act to authorize certain cities, counties, towns, and townships to subscribe to the stock of certain railroads,' in force Feb. 18, 1857." The title here recited is not the title of the act in question. It differs from it in several respects, though this was probably the one that was intended to be referred to. Supposing it to have been the one referred to, it is not pretended

that this act of March 27, 1869, embraces the town of South Ottawa, or the county of Kendall, whose bonds are the subject of the present suits. But it is urged that the reference to the act of 1857 is such a recognition of that act as to give it validity, if it had none before. This was certainly not the purpose of the act of 1869, nor do we think that such was its effect. The legislature could not thus, in 1869, give validity to a void act as an act passed in 1857, which was not constitutionally passed in that year; for that would be an evasion of the Constitution. It could at most give it vitality as a new act from the date of the act of 1869. But this it does not profess to do : it only adopts its provisions for the purposes of the act then passed. And if the legislature of 1869 could have validated all proceedings had under the supposed act of 1857, it did not do so. It did not profess to do it. No such purpose is indicated in it. The most that can be said is, that, in referring to the act of 1857, the legislature inadvertently supposed that it had been regularly passed. Whether such inadvertence was the result of a false suggestion by interested parties, or otherwise, is of no consequence. No intent to validate and establish the act of 1857, as a law, can be gathered from the terms of the act of March 27, 1869. To give to such a reference in a subsequent act, as is here relied on, the effect of validating or reviving or vitalizing a void or repealed statute, when no such intention is expressed, would be dangerous, and would lay the foundation for evil practices. The legislature might in this way be entrapped into the enactment or re-enactment of laws when it had no intention, or even suspicion, that it was doing so.

The other act relied on was passed on the twentieth day of April, 1869, and is entitled " An Act to amend an act entitled 'An Act authorizing certain cities, counties, towns, and townships to subscribe to the stock of certain railroads,' in force Feb. 18, 1857 ; " being the act in question, if the words " in force " are construed to refer to the date of its supposed passage. This amendatory act declares that in addition to the cities, counties, towns, and townships authorized by the said act to which this is an amendment, to subscribe to the stock of the Ottawa, Oswego, and Fox River Valley Railroad, the following portions of cities, counties, towns, and townships be authorized

to subscribe to the capital stock of said railroad in manner as provided in said act, except as hereinafter provided.   The act then proceeds to designate the portions of towns referred to.

The same observations apply to this act which have been made in regard to the act of March 27, 1869.   It does not profess or purport to give any new force or validity to the supposed act of 1857, or to validate any proceedings had under that act. It takes for granted — mistakenly, as we have seen — that the act was duly passed, and does nothing more.

The last-mentioned act could not, in any event, by any prospective effect, aid the holders of the bonds in suit; for the elections called to authorize their issue were held before this act was passed, as appears by the recitals in the bonds themselves.   Indeed, the election authorizing the Ottawa bonds was held in 1866, — long before the passage of either of the acts referred to; and, in the absence of any expression in the laws themselves, evincing such an intention, it can hardly be claimed that these laws gave any retroactive validity to elections which were without authority, and void, when they were held.

It is to be observed that these statutes were before the Supreme Court of Illinois when deciding the case of *Miller & Paddock* v. *Goodwin*, being set up and relied on in the answer of the defendants in that case; but the court evidently did not regard them as having the effect claimed.   The bonds were held to be void, and the collection of taxes to pay them was perpetually enjoined.

We do not perceive that the act of Congress, prescribing the mode in which the public acts, records, and judicial proceedings in each State shall be authenticated so as to take effect in every other State, has any bearing whatever on the case.   The authentication thus provided for was intended as evidence only of the existence of such acts and records, and not to give them any greater validity or effect than that which they had in the State from which they were thus accredited.   The act expressly declares that, when thus authenticated, they shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the State from whence they are taken.   It merely provides a mode of proving public records, leaving them, when proved, invested

with the same force and effect (and no other) which they have at home. But when a court of the United States is held in any State, it is bound to know the laws of such State the same as the domestic courts are.

> *Judgments reversed, and records remanded with directions to award in each case a venire facias de novo.*

MR. CHIEF JUSTICE WAITE, with whom concurred MR. JUSTICE CLIFFORD, MR. JUSTICE SWAYNE, and MR. JUSTICE STRONG, dissenting.

I am unable to agree to the judgment which has been rendered in this case. There is no doubt but that the construction which the courts of Illinois have uniformly given the Constitution of the State is binding upon us as a rule of decision. The difference between me and the majority of my brethren is as to the construction that has been given, not as to its effect when ascertained. After a careful consideration of all the cases to which our attention has been directed, I am forced to the conclusion that the question has been made by the courts of Illinois one of fact and not of law. The majority of this court think it has been made one of law. Such a construction might and probably would be more logical; but our duty is to ascertain what has been decided, not what should have been.

The case of *Spangler* v. *Jacoby*, 14 Ill. 297, is the first of a long series of cases in which this question has been considered; and, so far as I have been able to discover, little has been done since, except to reaffirm and apply what was there decided.

Looking, then, to that case, we find that *prima facie* an act enrolled, signed by the speakers of the two houses, approved by the governor, deposited in the office of the Secretary of State, and published under his superintendence among the laws certified by him, is a valid law. The language of the court is: " The act in question was signed by the speakers of the two houses, and it received the assent of the executive. *Prima facie*, therefore, it became a law." Afterward, in *Illinois Central Railroad Co.* v. *Wren*, 43 id. 79, it is said, " The laws certified by the Secretary of State, and published by the authority of the State, must be received as having passed the legislature in the manner required by the Constitution,

unless the contrary clearly appears." And, again, no longer ago than last year, in *Larrison* v. *Peoria, Atlanta, & Decatur Railroad Co.*, 77 id. 18, "If we find a law signed by the speakers of the two houses, and approved by the governor, we must presume that it has been passed in conformity to all the requirements of the Constitution, and is valid until the presumption is overcome by legitimate proof."

This law was enrolled; signed by the speakers of the two houses; approved by the governor; deposited in the office of the Secretary of State; published by him with the requisite certificate among the laws passed at the session of the legislature in 1857; acquiesced in by the people of the State as a valid law for more than thirteen years after its publication; accepted and acted upon by the inhabitants of South Ottawa in October, 1866, when they voted under it for a subscription to the stock of the railroad company, and authorized the issue of the bonds of the township in payment; recognized as a valid and existing law by the legislature of the State, March 27, 1869, and April 20, 1869, when laws were passed referring to it as in force, and amending it; and finally acted upon by the officers of the township, when, in obedience to the vote of the inhabitants, they subscribed to the stock of the railroad company, and issued the bonds authorized by the act in payment.

In this condition of things the courts were bound to take judicial notice of it as a law in force. This was expressly decided in *Illinois Central Railroad Co.* v. *Wren, supra,* where it was said, "Although we take judicial notice of all acts of the legislature signed by the governor and found in the office of the Secretary of State, and although for some purposes we may take judicial notice of the legislative journals, yet it is not our province, at the suggestion or request of counsel, to undertake to explore these journals for the purpose of ascertaining the manner in which a law duly certified went through the legislature and into the hands of the governor. If counsel say the journal shows a law to have been passed without calling the yeas and nays, let them make the requisite proof of that fact by means of the legislative journals, and introduce the proof into the record."

And again, during the same year, 1867, in *Grob* v. *Cushman*, 45 id. 124, where the question was as to the jurisdiction of the La Salle County Court, in a case which was brought before the Supreme Court for examination upon a writ of error, this language is used : —

"It is insisted that the La Salle County Court did not have jurisdiction of the subject-matter of this cause ; that the act of the legislature under which the jurisdiction is claimed never became a law in the mode prescribed by the Constitution. And counsel, in their argument, refer to the journals of the house in support of this position. On the trial below, no evidence from the journals was introduced. But it is now urged, that, as they are public records, the court will take judicial notice of them, and not require them to be embodied in the evidence. It is true that they are public records, but it does not follow that they will be regarded as within the knowledge of the courts, like public laws. Like other records and public documents, they should be brought before the courts as evidence. But when offered, they prove their own authenticity. Until so produced, they cannot be regarded by the courts."

Both these cases were decided two years before the bonds now in suit were issued.

Later, in 1871, in the case of *The People* v. *De Wolfe*, 62 id. 253, an application was made for a *mandamus* requiring a justice of the peace to issue an execution upon a judgment recovered before him. In his return, he stated that the act under which he assumed jurisdiction when he gave the judgment had never in fact been constitutionally passed, and gave the particulars of his claim in that behalf. In delivering the opinion, the court clearly considered the question presented as one of fact, for they say : —

" It appears by the return, which is not traversed, and is to be taken as true, &c. . . . Our decision is predicated solely upon the state of facts as set forth in the return in this case, without an inspection of the journals of the Senate, and we pass upon the validity of the act in question no further than as affects the present application in view of the admitted facts in the case."

It is difficult to see what could be done to manifest more clearly the determination of the court to make the question

whether a *prima facie* statute had been constitutionally passed one of fact, to be established by "legitimate proof" when a contest arises. This may operate to give an apparent statute effect under one state of circumstances, and not under another; but with that we have nothing to do. Our duty is ended when we have discovered and complied with the rule which the appropriate tribunal has established.

Under the operation of this rule the plaintiff below made out his case, when he proved the execution of his bonds and put them in evidence; and, in the absence of proof by the defendant, he was entitled to his judgment, even though the law might not have been constitutionally passed: because it was no part of the duty of the court "to explore the journals for the purpose of ascertaining the manner in which a law duly certified went through the legislature."

The question then is, whether, under the circumstances of this case, the defendant can be permitted to make the proof. This does not depend upon the construction of the Constitution, but upon the general principles of commercial law applicable to the Constitution as construed. The issue is made upon the fact of the passage of the law. *Prima facie* it was passed, and it was apparently in force. Both parties acting upon this *prima facie* case, and supposing it to be true in fact, have become bound: one has borrowed and the other lent. The lender has performed his part of the contract and delivered the money, and the simple question to be determined now is, whether, under such circumstances, the borrower can refuse to pay, because, upon further investigation, he has ascertained that the legislative journals do not contain the necessary evidence to establish the fact of the due enactment of the law. Reverse the case. Suppose the town had subscribed for the stock and paid the subscription, could the railroad company keep the money and refuse to issue the stock because, after the transaction, it had ascertained that a vote had not been taken by ayes and noes in one of the houses upon the final passage of the bill? Certainly not; and the reason is obvious. Under such circumstances, the law estops the party from asserting the falsehood of that which appears to be true. This rule has, from the beginning, been applied here to this class of cases. It was first stated in *Com-*

*missioners of Knox County* v. *Aspinwall,* 21 How. 545, where, using the language of Ch. B. Jervis in *Royal British Bank* v. *Tarquand,* 6 El. & Bl. 527, it was said: —

" We may now take it for granted that the dealings with these companies are not like dealings with other partnerships, and that the parties dealing with them are bound to read the statute and the deed of settlement. But they are not bound to do more. And the party here, on reading the deed of settlement, will find, not a prohibition from borrowing, but a permission to do so on certain conditions. Finding that the authority might be made complete by a resolution, he would have the right to infer the fact of a resolution authorizing that which, on the face of the document, appeared to be legitimately done."

It is unnecessary to refer to the numerous cases which have come up since. While some of them have gone further than the English court did in that from which the quotation was made, none have fallen short of it. We need not go further in this. The purchasers of these bonds were bound to read the statute under which they were issued, but they were not bound to do more. Finding it upon the statute-book, apparently in force, they had the right to infer that it was actually in force, and govern themselves accordingly.

It must be remembered that this is not a case of construction. The question is not whether a law admitted to be in force confers the necessary power, but whether a law which does confer the power, and is apparently in force, can be shown not to have been in fact passed according to the requirements of the Constitution, after parties have acted upon the faith of it and changed their condition. When the question is one of construction alone, all parties stand upon an equal footing, and each can judge for himself. If a mistake occurs, it is one of law and not of fact. Here it is one of fact. The bonds on which this suit is brought are *prima facie* valid; and, as between these parties, I think the law will not admit the testimony offered to show that they are void. In the absence of proof they stand. The question is one of evidence. It is not whether the law was passed, but whether testimony can be introduced to show that it was not. I think it cannot. To admit it would ignore a principle of commercial honor upon which we have made

a long line of decisions. I am not prepared to do so. If the courts of Illinois had been willing to take judicial notice of the legislative journals in determining what the law of the State is, there might be some propriety in requiring the people to do so. But when the courts make the question of overcoming a *prima facie* law one of fact, I think the people may do the same thing, and bring to their protection the same principles of estoppel which govern them in other cases. For these reasons I dissent from the opinion which has just been read.

NOTE. — At a subsequent day of the term, counsel for the plaintiffs in error moved the court for further instructions in these cases to the court below. MR. JUSTICE BRADLEY, on behalf of the court, said : " We do not think any further directions necessary in these cases. We hold that the estoppel set up by the plaintiff below should not be allowed, but that the defendant should be permitted to show the invalidity of the act relied on by the plaintiff. We recognize the construction of the Constitution of Illinois adopted by the State court, to the effect that a law is void if not passed by the requisite majority, and so entered on the journal. We also hold the existence of a law to be a judicial question, to be decided by the court, though framed in form as an issue of fact. It follows that the court below, on retrying the case, must itself be satisfied whether the law in question was or was not constitutionally passed, and the vote entered on the journals, and instruct the jury accordingly. The evidence, or means of ascertaining this fact, must be such as is legally applicable to such a case according to the laws of Illinois. But, strictly speaking, the issue is more properly referable to the court than to a jury. That it may be so framed the judgment will be amended, directing the court below to award in each case a *venire de novo*, or to allow the parties to amend their pleadings, as they shall be advised, in order to refer the trial of the issue to the court instead of the jury."