Howrv, J.,
delivered the opinion of the court:
Plaintiff, as an envelope manufacturer, in response to a proposal of the Postmaster General, made a bid for supplying the Government with a large quantity of envelopes and newspaper wrappers. Within 10 days from the date of the acceptance of its bid plaintiff. agreed to. enter into con *68 tract according to the conditions and requirements • of the specifications accompanying the proposal; and, furthermore, that if it should fail to perform the stipulations and agreements of any contract into which it might enter the said company and its sureties would forfeit and pay to the United States $200,000 as damages. Accompanying this bid was a. guaranty by a solvent corporation that in the event that a contract for furnishing stamped envelopes and newspaper wrappers according to the advertisement and specifications should be awarded to the plaintiff it would, within the time limited by the specifications, execute such contract, and in case of failure, the surety company agreed to forfeit and pay the sum of $25,000 to the United States. Eleven proposals were submitted, but plaintiff’s bid being the lowest, according to the departmental formulas, it was accepted and the contract to do the work was awarded on April 20, 1898, to plaintiff by the Postmaster General. The clay after the award the Third Assistant Postmaster General made to plaintiff a contract in quadruplicate, requesting it to sign, execute, and return the same. This plaintiff did on the day following the receipt of the contract, and accompanied the same with the required bond. The Postmaster General who made the award retired from office without signing the agreement and was immediately succeeded by another. The retirement of the one and the coming in of the other Postmaster General was April 21, 1898. Six days thereafter plaintiff telegraphed the department that it had made arrangements for the necessary drawings and had, contracted for certain paper for the term of the contract period. That day the Third Assistant replied by saying that the new Postmaster General had not signed the contract but was holding the matter in abeyance, at the same time requesting plaintiff to suspend, all action until further orders. The following month the new Postmaster General rescinded the order of his predecessor, who had practically made the contract with plaintiff,- and new proposals were called for by departmental advertisement. October 25, following, a 'new contract was let to-two-companies covering the period for which .plaintiff--had contracted. Plaintiff, by its contract,' *69 was to have received $2,460,556.22- and the estimated cost of furnishing the material approximated two millions of dollars, thereby indicating a considerable anticipated profit.
• Subsequently, plaintiff company brought suit in this court, and the defense that the contract had never been completed and was not binding as such until actually signed by the Postmaster General was overruled ■ and plaintiff recovered a judgment in the sum of $185,381.76 upon the authority of the case of Garfielde v. United States, 93 U. S. R., 242.
By section 3744 of the Revised Statutes all contracts of the Secretary of War, the Secretary of the Navy, and the Secretary of the Interior with individuals must be in writing and signed by the contracting parties with their names at the end thereof. Such is not the case with contracts made between individuals and the Post Office' Department. • In Garfielde’s case, sufra, it appeared that for conveying the mails proposals were invited, and the acceptance by the Post Office Department of the proposal of a bidder to so carry the mails created a contract of the same force and effect as if a formal contract had been written out and signed by the parties.
The court does not find it material now to review the circumstances upon which liability was declared, but makes allusion to the distinction existing in the draft of contracts between the several departments of the Government that the court’s reasons for rendering judgment at all may be better understood on the present motion.
The questions now presented arise upon the motion of the plaintiff and the countermotion of the defendants to amend the findings and for a new trial.
Plaintiff’s motion contains an objection to omit paper of air-dried quality; the cost of gum, ink, stamp dies, and pasteboard boxes; the cost of labor and incidental expenses; and ask that the judgment be increased. There is an infinite variety of detail connected with the motion which, in the view we are compelled to take, need not now be noticed.
The motion on behalf of the United States relates to the ldnd of machines contemplated in the performance of the work; as to how the envelopes were to be made; alleged *70 error of the court in stating that the Norman Paper Company, of Holyoke, entered into a contract with plaintiff for the supply of air-dried paper, for want of consideration. Defendants deny that anticipated profits can be recovered. Connected with the. motion there is a multitude of detail, also'unnecessary novV to be considered. The reasons for new trial alleged on the part of the defendants are errors of fact, error of law, newly discovered evidence, and because fraud, wrong, and injustice have been done in the rendition of the judgment to the United States.
The alleged errors of law and fact may be eliminated in considering newly discovered testimony under what is known as. the two years’ statute relating to the granting of new trials in this court.
Section 1088 of the Revised Statutes provides that—
“The Court of Claims, at any time while any claim is pending before it or on appeal from it or within two years next after the final disposition of such claim, may, on motion on behalf of the United States, grant a new trial and stay the payment of any judgment therein, upon such evidence, cumulative or otherwise, as shall satisfy the court that any fraud, wrong, or injustice in the premises has been done to the United States; but until an order is made staying the payment of a judgment, the same shall be payable and paid as now provided by law.”
The section cited was the original act of June 25, 1868, 15 Stat., 75. Where fraud, wrong, or injustice be charged it was never contemplated that the statute should be applied where ,an error of law might be corrected- on appeal. But where facts are involved it is difficult to attach conditions to the right of the Government to a new trial. The word “may,” as used in the statute, means “shall” under the principle that where a statute directs the doing of a thing for the sake of justice or the public good the word may is the same as the word shall. Rex v. Barlow, 2 Salk., 609; Henry v. United States, 15 C. Cls. R., 162. The statute does not so much give the court discretion as it does .confer a power, and this power must be exercised whenever a prima facie case is shown.
*71 The court is without power to deprive the United States of the benefit of a law designed to prevent fraud, wrong, or injustice when, in the opinion of the court, new testimony will change the result.
It will be seen that the relief contemplated is in respect to matters of fact. In United States v. Young, 94 U. S., 260, the Supreme Court said that after the new trial - is granted this court resumes control of the case and the parties; and, though such a power may be somewhat anomalous, it is a power expressly given, and that every person submitting himself to the jurisdiction of the court for the prosecution of his claim submits himself to the operation of the statute.
The policy of the act directing the court to grant a new trial where it probably appears that fraud, wrong, or injustice has been done the Government was dictated by the fact that the agents of the Government are at great disadvantage in defending suits in this court on account of their personal ignorance of the facts and witnesses and the evidence necessary to rebut the petitioner’s case, for all which, .as said in Russell's case,. 13 Wall., 668, they must depend on distance and interested parties or parties whose sympathy and, perhaps, whose interest is with the .claimants, whilst the claimants have had years to prepare and get up their cases and to select the most favorable proofs to sustain them.
There are two questions now to consider relating to the statutory allegation of fraud, wrong, or injustice. (1) By Finding XI it appears that the plaintiff company claims that it made and entered into a contract whereby i.t was to be supplied with all the white and amber paper required to make the stamped envelopes under the specifications during the term of the contract at 5-f cents a pound for the first quality and 4-J cents a pound for the second quality, and that all of said paper was air-dried quality. It is shown that the representative of the Government and a post-office inspector made every reasonable effort to secure all possible evidence which came to their knowledge prior to the trial, and that since then they have found newly discovered evidence so material as to the cost of executing the contract *72 that the cumulative evidence will produce a different judgment as to the cost of the first and second quality of paper and the labor required to manufacture the stamped envelopes. Numerous witnesses, it appears, will show that the cost of the first quality of paper necessary to make the number of envelopes covered by the agreement would have been during the contract 'period not less than 8 cents per pound and even more.
Besides which, the report of the Post Office Department gives the names of apparently reputable people whose opportunities are such as to make their testimony valuable that the cost of paper necessary to make the second quality envelopes would have been during the period of the contract not less than 7 cents per pound and that the waste clippings would not have been worth more than 2 cents per pound.
It is further shown that a number of witnesses will testify that while there was not on the market during the period of the contract a paper made strictly in conformity with the formula set out in the specifications for the paper for the first quality envelopes, there was on the market a pape? made from a formula somewhat similar.
The particulars of what paper makers will say, supplemented by the denominated cost of record paper under the laws of Massachusetts, seem to the court very material in considering this case.
That part of the eleventh finding fixing the price of white and amber paper to make the stamped envelopes was ascertained by the court as the result of an average of all the testimony of the witnesses who spoke to the subject. The court deems it vitally essential to the ends of justice that the whole matter be again the subject of investigation on the cumulative testimony.
(2) There is another and different phase to this matter. Finding XI discloses that plaintiff made and entered into an agreement or contract whereby it was to supply all the paper to make the stamped envelopes under the specifications during the term of the contract. But nowhere in the record does it appear' that there was a written contract for *73 the purpose. On the contrary an inspection of the record establishes the fact that there was no written contract at all. As the contract was for a term of years the local statute of frauds had distinct application.
The Massachusetts statute is as follows:
“No contract for the sale of goods, wares, or merchandise, for the price of fifty dollars or more, shall be good or valid unless the purchaser accepts and receives part of the goods so sold or give something in earnest to bind the bargain or in part payment, or unless some note or memorandum in writing of the bargain is made and signed by the party to be charged thereby or by some person thereunto by him lawfully authorized.” (1 Mass. Revised Laws, 1902, p. 655.)
As it does not clearly appear that the plaintiff company had accepted and received any part of the paper contracted for or had given something in earnest to bind the bargain in part payment, and as the alleged contract was not made in writing, the court is unable to decide that there was any binding agreement between the parties for the delivery of the paper by the plaintiff. It may be that upon a new trial the testimony upon this point will set forth more clearly the terms and conditions relating to the alleged contract, by means of which the court will be enabled to determine that the statute of frauds does not apply.
The well understood meaning of cumulative evidence is that kind of evidence which tends to prove the same point to which other evidence has been directed. Evidence of a cumulative nature is evidence composed of accumulated parts; that is, parts of addition found, or becoming larger, by successive additions. If these kinds of addition do not strengthen defendants enough to overthrow a result adverse to the United States, then the cumulative force of such testimony should be rejected.
There are cases where trial courts limit testimony upon a given point, and new trials can not be granted merely to allow more witnesses upon the disputed matter of fact which has been so plainly proved as to satisfy every reasonable mind. But in all such cases the power to hear ought not to be qualified under the provisions of section 1088 by a refusal to hear newly discovered evidence unless the point in dispute *74 has been so clearly established upon the first trial that the court is unable to make application of any additional testimony to reach a different conclusion.
Whilst section 1088 seems unreasonably harsh and whilst it does at times have the effect of delaying a litigant in the prosecution of his. rights, courts .can not qualify the effect of a law intended to supplement and even supersede common-law procedure relating to newly discovered testimony obtainable in ordinary trial courts, where witnesses are often limited to give their respective versions upon a single point at issue.
There may be instances where under this two years’ statute a new trial could not be granted, but the case at bar is not one of them. Beluctant as we are to entertain a motion having the effect of another investigation, the court is constrained to direct that a new trial be granted and the proposed proof be taken, with the right on the part of the plaintiff to take testimony on the same point. In the taking of the testimony the parties will be governed as far as can be by the rules of the court.