LARRY LEWIS HOLTZ, PLAINTIFF AND APPELLANT, v. TIM BABCOCK, GOVERNOR OF THE STATE OF MONTANA, THE STATE AERONAUTICS COMMISSION, OF THE STATE OF MONTANA, AND CLARENCE R. ANTHONY, ET AL., AS MEMBERS OF SAID STATE AERONAUTICS COMMISSION, CHARLES A. LYNCH, MONTANA AIRCRAFT COMPANY, A MONTANA CORPORATION, MID-CONTINENT LEASING COMPANY, INCORPORATED, A TEXAS CORPORATION, COLORADO NATIONAL BANK, A NATIONAL BANKING CORPORATION, JOHN HOLMES, STATE AUDITOR OF THE STATE OF MONTANA, WALTER ANDERSON, STATE CONTROLLER AND EX OFFICIO PURCHASING AGENT; AND THE STATE OF MONTANA, DEFENDANTS AND RESPONDENTS.

No. 10536.
Submitted September 9, 1963. Decided December 19, 1963.
389 P.2d 869. Re-hearing denied March 19, 1964.
390 P.2d 801.

Erickson and Richards, Helena, Leif Erickson, Helena (argued), for appellant.

Loble and Picotte, Helena, Gene A. Picotte, Helena (argued), Kenneth D. Beyer, Helena (argued), for respondents.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from an order denying plaintiff's application for an injunction and dismissing plaintiff's amended complaint, entered in the district court of Lewis and Clark County.

At the outset defendants have filed suggestion of diminution of the record filed by plaintiff upon this appeal on the ground that such record does not contain certain documents of record in the district court, and defendants move that such documents be added to the record on appeal. This motion is granted, thus bringing before the court the complete record of the district court.

The action was commenced on May 9, 1962, by the filing of a petition for a writ of mandate by the plaintiff. In the same action plaintiff sought to enjoin and restrain defendants from further enforcing or attempting to perform an agreement which will hereafter be further referred to. On the date of the filing of the petition, an order was entered for the issuance of an alternative writ of mandate, returnable on June 6, 1962. On

May 31, certain defendants filed motion to quash the alternative writ, and contemporaneous therewith a motion to dismiss the complaint. Thereafter other defendants appeared by motions to quash and dismiss.

The various motions were heard before the court on June 8, and on June 26 an order was entered quashing the alternative writ of mandate on the grounds that the relief sought did not justify the issuance of the writ, and secondly, that a mandamus action could not be joined with an injunction action. The motions to dismiss were denied and plaintiff was ordered to file an amended complaint within ten days, the order continuing:

"* * * so that prompt trial may be had on the Plaintiff's contentions urged at the hearing on the Motions, which are the Plaintiff's claim that the Aeronautics Commission does not have the power to expend funds for the purpose, and second the plaintiff's claim that if the power exists the law relative to competitive bids has not been followed."

Pursuant to this order on July 9, an amended complaint was filed which sought to permanently enjoin and restrain the defendants from further enforcing the agreement or attempting to perform it or expending any further sums thereunder, and that the defendants be required to restore certain funds to the state aviation fund.

Various motions seeking to strike portions of the amended complaint and to dismiss the same were filed by the various defendants, and notice given that they would be brought on for hearing on August 1 and pursuant thereto such hearing was held. On August 27 an order of dismissal was entered providing that the several motions to dismiss plaintiff's amended complaint be granted; that the application for injunction be denied; and that plaintiff's action be dismissed on the ground that the amended complaint failed to state a claim upon which relief can be granted. Notice of entry of such order was given and this appeal taken.

The amended complaint, inter alia, alleges, so far as pertinent here, that the defendant Charles A. Lynch is an employee of the Montana State Aeronautics Commission, hereafter called the Commission, and that Lynch entered into an agreement with defendant Mid-Continent Leasing Company, Incorporated, hereafter referred to as Mid-Continent, for the purchase of a 1962 Beechcraft 65 Queen Air airplane, the agreement being dated March 15, 1962, and copy is attached to the complaint as an exhibit. It is further alleged that this agreement according to the understanding of all defendants constitutes a purchase agreement although it is called an airplane lease. The agreement is entitled "Aircraft Lease," and entered into between Mid-Continent, as Lessor, and the State of Montana, Montana Aeronautics Commission, Helena, Montana, as Lessee. The agreement is signed for Mid-Continent by its President and by "State of Montana, Montana Aeronautics Commission by Charles A. Lynch, Its Director." Also that the defendant state purchasing agent has never entered into the agreement, nor have the defendants, State of Montana nor the Commission signed it, although it purports to be signed for them by their agent; that Lynch purporting to act for the Commission requisitioned the purchase of the Airplane from the Montana Aircraft Company and pursuant to the requisition, the state purchasing agent, with the consent and approval of the Governor, authorized the purchase from the defendant Montana Aircraft Company, pursuant to purchase order, copy being attached to the complaint as an exhibit. The purchase order does not indicate the consent or approval of the Governor thereto, but does show "Approved Board of Examiners: February 19, 1962." (The Board of Examiners consists of the Governor, Attorney General and Secretary of State.) The purchase order in describing the property, terms and conditions provides:

"For the LEASE OF A 1962 BEECHCRAFT 65 QUEEN-AIR, EQUIPPED AS PER THE ATTACHED AGREEMENT AND EXTRA EQUIPMENT LIST:

LEASE TO COMMENCE MARCH 15, 1962, AND TO CONTINUE UNTIL MARCH 15, 1967

LEASE RATE FROM MARCH 15, 1962 TO MARCH 15, 1967, 5 YEARS, $2,990.00 PER MONTH ($2,990.00) IF PURCHASE OPTION IS EXERCISED, AS PER THE ATTACHED AGREEMENT:

FOR THE LEASE PURCHASE OF 1962 BEECHCRAFT 65 QUEENAIR EQUIPPED AND PRICED AS PER THE ATTACHED AGREEMENT ($155,951.00)

AIRCRAFT TO BECOME THE PROPERTY OF THE MONTANA AERONAUTICS COMMISSION AT THE END OF THE LEASE AGREEMENT, UPON THE PAYMENT OF $50.00                                        ($50.00)

OUTRIGHT PURCHASE OF THE AIRCRAFT MAY BE MADE BY THE MONTANA AERONAUTICS COMMISSION AT ANY TIME ON AN ADJUSTED PRICE BASIS BY THE TERMS OF THE ATTACHED AGREEMENT, ALL INSURANCE REQUIRED, THEREBY, INCLUDING HULL, LIABILITY AND PROPERTY DAMAGE, MUST BE PROCURED AND PAID FOR BY THE MONTANA AERONAUTICS COMMISSION."

The complaint further alleges that Lynch, acting for the Commission, requisitioned payments and the Controller directed the Auditor to draw warrants in payment and that the Controller will upon receipt of requisitions direct issuance of warrants and the Auditor will issue them "unless they are restrained therefrom by order of this Court."

Further, that the principal use of the airplane is by the Governor and such use will continue in the future unless restrained; that the Commission and Controller have never completed the formal requirements to enter into the agreement, and the State and the Commission are not bound by it, but

nevertheless defendants have acted, and will continue to act, as though the agreement is binding unless they are enjoined and restrained.

That neither the Commission nor Controller advertised for bids; that the agreement is illegal and void but defendants will continue to act as though it is binding upon the State and the Commission, unless and until defendants are enjoined and restrained.

That the plaintiff has no adequate remedy at law; that it was and is the duty of the Commission to disavow the actions of Lynch; to take action to recover the sums already paid out and to take no further action which will result in further expenditures; it is the duty of the Governor to disapprove the agreement and to instruct the Controller and Auditor to cease taking action to implement them; it is the duty of the Controller to refuse to authorize any more expenditures and that of the Auditor to refuse to draw any more warrants, which will result in such expenditures; that such defendants, however, continue to treat such agreement and arrangement as valid and subsisting and is or should be binding upon the State, and that any demand that they perform their duty is futile and would be useless.

That the payments made from the State Aviation Fund and those threatened have been and will be an injury to said fund, and have been and will be an irreparable damage to plaintiff and to all other licensed taxpayers similarly situated.

Plaintiff then prayed for an order permanently enjoining and restraining defendants from further enforcing the agreement for the purchase of the airplane or from further attempting to perform it or expending any further sums under the agreement, and that the defendants be required to restore the funds to the State Aviation Fund.

Plaintiff contends that the Court erred in granting the motions to dismiss the amended complaint, and in making its order

of dismissal. Plaintiff states that only two questions are raised by the amended complaint, and the motions to dismiss, being:

(1) May the State Aeronautics Commission purchase an airplane without advertising or calling for competitive bids?

(2) If so, may funds of the State Aviation Fund be expended to provide transportation for the Governor traveling on business not connected with the duties of the State Aeronautics Commission?

While this may be plaintiff's contention in this Court, it is apparent from the order of June 25, 1962, when the amended complaint was ordered filed, the only questions to be raised were:

(1) Does the Aeronautical Commission have power to spend funds for the purchase of an airplane, and

(2) If they have such power, is it necessary to follow the law relative to competitive bids?

To illustrate further that these were the contentions argued in the district court, we quote from Judge Foot's memorandum, which he did not file, but copies having been furnished to counsel, wherein he quoted the language contained in the order of June 25, 1962, heretofore referred to, and stated:

"Plaintiff contends that by reason of Judge Brownlee's ruling that the motion to dismiss the pleading be denied, such ruling became the law of the case and defendants are not now entitled to challenge the amended complaint by motions to dismiss or motion to strike and further that under Rule 12(g), M.R.Civ.P., defendants cannot properly interpose such motions.

"Defendants contend that as Judge Brownlee granted the motion to quash the alternate writ of mandate and denied the motion to dismiss and ordered an amended complaint filed, and as plaintiff's amended complaint is intentionally almost exactly identical with the original complaint, the amended complaint should be stricken in its entirety as not being an amended complaint but merely a repetition of the original.

"It is the Court's view that neither of such positions is ten-

able. Judge Brownlee further ruled as above-stated, and in accordance with agreement of counsel at the hearing before him, that two issues of questions only were to be presented, namely, does the Commission have authority to spend monies of the aviation fund, (that is, does the Commission have the authority to acquire the aircraft in question and to use such fund to pay for the same) and second, did the Commission in this transaction follow the law relative to competitive bidding; that is, if the Commission has authority to make and complete this transaction, was it legally bound to comply with the law relative to competitive bidding?

This matter was placed before the court in the consolidated motions to dismiss and to strike filed by certain of the defendants on July 16, 1962, wherein it was moved to strike as follows:

"1.   The whole of said amended complaint, upon the ground that the same is impertinent, in that it contains allegations concerning, and attempts to raise, issues which the plaintiff, in open court, through his counsel of record, has previously stated and stipulated are not and would not be involved in the case. Specifically, plaintiff's counsel previously stated in open court to the Honorable Judge presiding herein that he would and did abandon all contentions and issues and questions and theories in said action, except (a) the issue of whether the State Aeronautics Commission possessed legal power to acquire the aircraft involved, and (b) the issue of whether, if said Commission had such power, it was necessary to call for competitive bids in connection with the acquisition of the same * * *."

Since this was the theory of the case as advanced and argued by the plaintiff in the district court, we shall turn our attention to the first issue:

Does the Aeronautics Commission have power to expend funds to purchase an airplane?

Section 1-501, R.C.M.1947, so far as pertinent here, and before its amendment in 1963, provided:

"*State aviation fund. Creation of state aviation fund.*— All costs and expenses of administering this act, including the salaries of employees and assistants provided for in section 1-203, the expenses of members of the commission, and all other disbursements necessary to carry out the purposes of this act, shall be paid out of the state aviation fund hereby created.

"The state aviation fund shall be made up of the following revenues to-wit: All gifts and all legislative appropriations for said fund; all moneys received from any branch or department of the federal government, or from other sources, for the purposes mentioned in this act or for the furtherance of aeronautics generally in this state. * * *"

Plaintiff contends that the language above-quoted is clear and spells out the purposes for which the funds of the Commission may be spent, and that they may not be spent for any other purpose. The next succeeding section of our Code, section 1-502, R.C.M.1947, provides in part:

"The acquisition of any lands for the purpose of establishing airports or other air navigation facilities; the acquisition of any airport protection privileges; the acquisition, establishment, construction, enlargement, improvement, maintenance, *equipment* and operation of airports and other air navigation facilities whether by the state separately or jointly with any municipality or municipalities thereof; the assistance of this state in any such acquisition, establishment, construction, enlargement, improvement, maintenance, *equipment,* and operation; and the exercise of any other powers herein granted to the commission are hereby declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity, and such lands *and other property* and privileges acquired and used by the

state in the manner and for the purposes enumerated in this act shall and are hereby declared to be acquired and used for public and governmental purposes and as a matter of public necessity." (Emphasis supplied.)

Webster's Third New International Dictionary defines "equipment" as "The implements (as machinery or tools) used in an operation or activity," "all the fixed assets other than land and buildings of a business enterprise;" "the rolling stock of a railway," "equipment usually covers everything, except personnel, needed for the efficient operation or service * * *."

By section 1-103, R.C.M.1947, the policy of this state as to the Aeronautics Commission has been declared by the legislature in these words:

"It is hereby declared that the purpose of this act is to further the public interest and aeronautical progress by providing for the protection and promotion of safety in aeronautics; by co-operating in effecting a uniformity of the laws relating to the development and regulation of aeronautics in the several states; by revising existing statutes relative to the development and regulation of aeronautics so as to grant to a state agency such powers and *impose upon it such duties that the state may properly perform its functions relative to aeronautics* and effectively exercise its jurisdiction over persons and property within such jurisdiction, may assist in the promotion of a statewide system of airports, may cooperate with and assist the political subdivisions of this state and others engaged in aeronautics, *and may encourage and develop aeronautics;* by establishing uniform regulations, consistent with federal regulations and those of other states, in order that those engaged in aeronautics of every character may so engage with the least possible restriction, consistent with the safety and the rights of others; and by providing for co-operation with the federal authorities in the development of a national system of civil aviation and for co-ordination

of the aeronautical activities of those authorities and the authorities of this state by assisting in accomplishing the purposes of federal legislation and eliminating costly and unnecessary duplication of functions." (Emphasis ours.)

By section 1-204, R.C.M.1947, the general powers and duties of the Commission are set forth. Sub-section (a) provides:

"(a)   The commission shall have general supervision over aeronautics within this state. It is empowered and directed to encourage, foster, and assist in the development of aeronautics in this state and to encourage the establishment of airports and other air navigation facilities."

Insofar as the definition of aeronautics, that is contained in sub-division 2 of section 1-102, R.C.M.1947, which reads:

"2.   *Aeronautics' means transportation by aircraft;* the operation, construction, repair, or *maintenance of aircraft,* aircraft power plants and accessories, including the repair, packing and maintenance of parachutes; the design, establishment, construction, extension, operation, improvement, repair, or maintenance of airports, restricted landing areas, or other air navigation facilities, and air instruction." (Emphasis ours.)

Since the Commission is given the general power delineated by section 1-204, subd. (a) "to encourage, foster, and assist in the development of" transportation by aircraft, and the operation and maintenance of aircraft, it seems obvious that it is empowered to purchase an airplane or airplanes. The Commission is likewise charged with the duty of enforcing aeronautical laws and regulations under sub-section (j) and given the power to conduct investigations concerning accidents in aeronautics within this State under sub-section (k), neither of which, in our opinion, could be properly performed unless the Commission had aircraft at its disposal.

In view of these provisions of our law, assuming as we must the need and use to be legitimate, it is apparent that the cost of an airplane would be an expense of administration to be

paid out of the State Aviation Fund as provided by section 1-501, R.C.M.1947.

We therefore hold that the Aeronautics Commission does have power to expend funds from the Aviation Fund to purchase an airplane or airplanes.

Turning now to the second proposition, in the exercise of such power is it necessary to follow the law relative to competitive bids?

Before entering upon this discussion, it is the contention of the plaintiff that the motions to dismiss admit for the purpose of this appeal that the aircraft was purchased by the defendant Commission. He asserts that under Rule 12, M.R. Civ.P., a motion to dismiss for failure to state a claim on which relief can be granted admits all facts well-pleaded, and for this purpose has the same effect as a demurrer under our form of practice. We held in a recent decision, Payne v. Mountain States Telephone & Telegraph Co., 142 Mont. 406, 385 P.2d 100, that a motion to dismiss under Rule 12 is equivalent under our present procedure to a demurrer under our former procedure.

However, where an instrument is attached to and made a part of the pleading, the rule announced in Montana Amusement Securities Co. v. Goldwyn Distributing Co., 56 Mont. 215, 223, 182 P. 119, 121, becomes applicable. In that case, this court stated:

"'* * * A meaning not fairly deducible from the terms of the instrument cannot be inferred; its intention is to be found in it; and to plead that it has a different meaning from what its plain terms import is to proffer averments which the instrument itself contradicts. In Dillon v. Barnard, 21 Wall. 437, 22 L.Ed. 673, Mr. Justice Field, speaking for the court said: 'A demurrer only admits facts well pleaded; it does not admit matters of inference and argument however clearly stated; it does not admit, for example, the accuracy of an alleged construction of an instrument, when the instrument itself is set forth in the

bill, or a copy is annexed, against a construction required by its terms, nor the correctness of the ascription of a purpose to the parties when not justified by the language used. The several averments of the plaintiff in the bill as to his understanding of his rights, and of the liabilities and duties of others under the contract, can, therefore, exert no influence upon the mind of the court in the disposition of the demurrer'."

This has been the holding of Federal Courts in interpreting their Rule 12, after which our Rule 12 is patterned.

In Imperial Oil & Gas Products Co. v. United Gas Pipe Line Co., 77 F.Supp. 336, 341 (D.C.La.1948), the court in its opinion stated:

"Of course, the motion to dismiss admits all the allegations of fact of the complaint as modified by the provisions of the contract and other exhibits annexed thereto."

Again, the United States Court of Appeals, District of Columbia Circuit, in Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252, with respect to motions to dismiss states:

"* * * While the appellees' motions for dismissal admit, for purposes of the motion, all the well pleaded facts in the complaints, such admission does not, of course, embrace sweeping legal conclusions cast in the form of factual allegations."

In Volume 1A, Federal Practice and Procedure, Barron & Holtzoff, respecting motions to dismiss under Rule 12, the authors comment:

"The truth of allegations in the complaint is not admitted by a motion to dismiss if they are in conflict with facts judicially known to the court, or contradicted by exhibits attached to or referred to in the complaint." pp. 330-331. See also Zeligson v. Hartman-Blair, Inc., 126 F.2d 595, 597 (10th Cir.1942), wherein the court stated:

"The motion to dismiss admitted all facts well pleaded, but it did not admit the legal effect ascribed by the pleader

to the writing. The writing was attached to the first amended complaint as an exhibit and its legal effect is to be determined by its terms rather than by the allegations of the pleader."

Professor Moore in Moore's Federal Practice, Vol. 2, p. 2244, puts it this way:

"* * * For the purposes of the motion, the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." See also the long list of cases in the Supplement supporting this statement.

It should be noted that in adopting the Civil Rules, Montana did not follow Rule 65 of the Federal Rules. Our Rule 65 provides:

"The procedure for granting restraining orders and temporary and permanent injunctions shall be as provided by statute." Except then for the more liberal rules of pleading our former practice still prevails and previous decisions of this court interpreting the statutes dealing with injunctions remain as the prevailing law.

Before entering further on this discussion, we preface it upon the result reached, since, the matter will be returned to the district court for further proceedings. Because of this we shall discuss certain matters, not because they are necessary to a determination of the rather narrow question presented, but because these matters will doubtless arise on further proceedings, if they are to be had, and may be of aid to court and counsel.

In a proceeding seeking injunctive relief the right should not be doubtful, doubts should be removed by a proper proceeding and the right made certain.

While it is true that when equity secures jurisdiction it retains it for all purposes, the general rule also is that when the terms of a contract are vague, ambiguous, indefinite or uncertain and there are other remedies available at the law the

court need not accept jurisdiction. In Emery v. Emery, 122 Mont. 201, 217, 200 P.2d 251, 261, it is stated:

"In addition to having a clear right there must also be an apparent and pressing necessity for an injunction. The injury threatened must be imminent and such as can only be avoided by an injunction. To entitle an applicant to an injunction he must show, not only that he is in danger of losing a substantial right but also that he is in no fault and any element of fraud in applicant's case or misrepresentation in his application will prevent the court from granting him injunctive relief. It is a universally recognized rule that an injunction should not issue upon the applicant's mere apprehension that some illegal act will be done. See International Register Co. v. Recording Fare Register Co., 2 Cir., 151 F. 199. Compare Sailors' Union of the Pacific v. Hammond Lumber Co., 9 Cir., 156 F. 450, certiorari denied 208 U.S. 615, 28 S.Ct. 567, 52 L.Ed. 646.

"In 28 Am.Jur., 'Injunctions,' pages 442, 443, sec. 268, it is said: 'While an application for an interlocutory injunction does not involve a determination of the merits, it does involve the exercise of a sound discretion. That discretion can be exercised only upon a determination, in the light of the issues and of *the facts* presented, whether the complainant has made or has failed to make such a showing of the gravity of his complaint as to warrant interlocutory relief. A complainant is not entitled to an injunction pending the litigation merely because the only relief which he seeks is injunction or because he alleges that without it he will suffer irreparable injury. The writ will issue only where it appears that there is a substantial question to be tried, and where the case is clear and free from doubt. * * * It is a cardinal principle of equity jurisprudence, however, that a preliminary injunction will not issue in a doubtful case or in one in which the wrong or

irreparable character of the apprehended injury is not manifest.' (Emphasis ours.)"

Here, while plaintiff calls the agreement a purchase contract the copy of the agreement annexed to his complaint is in the form of a lease and is so named. The requisition submitted by the Commission and approved by the state purchasing agent and the board of examiners requisitions a lease.

"Where the existence of a contract is in doubt, or its existence is not proved with that degree of certainty which the law requires, or where its terms are vague, ambiguous, indefinite, or uncertain an injunction against a breach thereof will be refused, the relief being improper where it is not clear what acts are to be performed. To authorize the issuance of an injunction the terms of the agreement must be so precise that neither party could misunderstand them. Where there is no immediate impending injury irreparable in nature, complainant will be left to establish his right at law." 43 C.J.S. Injunctions, § 80, p. 552.

From what we have heretofore said it is clear that if doubtful, normally injunctive relief would not be mandatory but would be discretional. *But,* as previously discussed, when the parties and the district court narrowed the issues, it seems that this second issue should be met head-on.

Therefore, for the purposes of this opinion we shall *assume* as respondents argue that the agreement is a *lease,* even though such an assumption will make no difference, as will later appear. Now then, our problem is, laying aside for the moment possible defenses, does such a lease agreement for the expenditure of a sum of public money for an item of equipment constitute such a "purchase" as to be within the Legislative enactments requiring bids?

We are aware that no provisions have been laid down by the Legislature with respect to such rental leases entered into by the state as has been done when they are entered into by a county wherein they are to be deemed and construed as sales

under sub-division (3) of section 16-1803, R.C.M.1947. Yet here in view of the optional provisions contained in the lease, the amount to be expended thereunder, and public considerations in general, we feel the answer to our question must be in the affirmative.

The court in sustaining the motions to dismiss did not rule upon the various motions to strike portions of the complaint, and without going into the merits of each it is very apparent that many of such motions are meritorious and the portions of the complaint attacked should be stricken. Particularly we refer to those allegations which concern the uses to which the airplane is to be put by the Commission. It is to be assumed that public officials will use the property of the state for the purposes for which it was secured, and if they fail to do so the chief law officer of the state, the attorney general, would be the proper officer to inquire, and if proceedings are necessary in any such respect he would be the proper officer to institute and maintain them.

As was said in State ex rel. Olsen v. Public Service Comm., 129 Mont. 106, 117, 283 P.2d 594, 600:

"The state being an interested party it is generally ruled that the attorney general is the proper party to determine the necessity and advisability of undertaking or prosecuting actions in its behalf. 5 Am.Jur., Attorney General, § 10, p. 239, and see State ex rel. Peterson v. City of Fraser, 191 Minn. 427, 254 N.W. 776."

In State ex rel. Mitchell v. District Court, 128 Mont. 325, 340, 275 P.2d 642, 650, this court stated:

"In 28 Am.Jur., Injunctions, §§ 162, 163, pp. 352, 353, it is said: 'Equity is conversant only with matters of property and the maintenance of civil rights. It will not interfere by injunction with the duties of any department of the government except under special circumstances and when necessary to the protection of property or other rights against irreparable injury. * * * Nor will it ordin-

arily assume jurisdiction to prevent public officials or servants from doing their duty as required by law, or performing acts required by law to be performed which are not in excess of their authority, unless such acts are done in such a manner as to inflict irremediable loss or injury upon innocent individuals. Equity will not attempt by injunction to substitute its own discretion for that of such officials in matters belonging to the proper jurisdiction of the latter. Where a public officer essays to exercise the jurisdiction conferred upon him, his errors, although subject to subsequent correction, cannot be enjoined as an arbitrary exercise of his authority. * * *

" '* * * Public officers or boards will not be restrained from acting in the fulfillment of their duties as such on the mere supposition that they will act wrongfully, or will not follow the law.

" 'Persons or corporations seeking to restrain acts of public corporations or officials must have sufficient title or interest to enable them to maintain the suit. Suits for the protection of public rights are ordinarily brought by the attorney general. * * * Ordinarily private citizens or corporations must possess something more than a common concern for obedience to law before they will be permitted to maintain injunction suits against public officers. * * * As a general rule, private citizens may not restrain official acts when they fail to allege and prove damage to themselves different in character from that sustained by the public generally'."

Having answered the first contention of the plaintiff a question arises in that since the Commission had the right to purchase an airplane, whether any irreparable injury can occur to plaintiff, and thus there is a serious doubt about the right of the plaintiff to maintain this action further. However, by reason of the political overtones of many allegations in the complaint, this question of capacity will be waived solely for

the purpose of our decision on this appeal in order that we may consider the full matter, though by such waiver we are not to be understood as establishing a precedent on this point now or in any further proceedings.

With these comments we turn now to the second question: Is it necessary for the Commission to follow the law relative to competitive bids?

Plaintiff contends that in order to purchase an airplane, it being supplies or equipment, section 82-1913, R.C.M.1947, must be complied with. This section is hereinafter quoted.

He further contends that the state officials took all but one of the steps required to make the purchase, that being advertising for bids, in that a requisition was made, submitted to the state purchasing agent for approval, and it was so approved.

Defendants contend that the Commission has express statutory power to contract and can therefore make any lease or purchase regardless of the general statutes relative to state agencies. This authority they represent is contained in subdivision (n) of section 1-204, R.C.M.1947, which reads:

"(n)   Authority to contract—The commission may enter into any contracts necessary to the execution of the powers granted the commission by this act."

Defendants further contend:

(1)   That the general statutes in Chapter 19 of Title 82, R.C.M.1947, have no application here because they apply only to purchases and the Commission has not purchased the airplane but has only leased it;

(2)   That assuming arguendo it was a purchase, the statutes relative to competitive bidding and preference for Montana residents do not apply since they are applicable to purchases of "supplies and materials" and the airplane is neither; and

. (3)   Again assuming arguendo that the purchasing statutes apply to the acquisition of the airplane, they do not apply here

because it was an emergency acquisition within the meaning of section 82-1919, R.C.M.1947.

We will trace the procedure to be followed in making purchases as delineated in our statutes before entering into a discussion as to the contentions of the parties.

In 1921, the Legislature created a State Purchasing Department in charge of a State Purchasing Agent, and provided that the State Controller should be ex officio the State Purchasing Agent. Section 82-1901, R.C.M.1947.

Section 82-1902, as amended in 1961, provides:

*"Duties of state purchasing agent.* The state purchasing agent shall, under the restrictions of this act, have full and sole power and authority and it shall be his duty to contract for and purchase or direct and supervise the purchase and sale of all supplies of whatever nature necessary for the proper transaction of the business of each and every state department, commission, board, institution, or official. For the purpose of making such purchases and contracts the state purchasing agent shall be and is hereby made the purchasing agent of and for each and every state department, commission, board, institution and official."

Section 82-1904, as amended in 1961, provides:

*"Authority to purchase.* An estimate or requisition presented by the department, commission, board or state official in control of the appropriation or fund against which such contract or purchase is to be charged, must be approved by the state purchasing agent, and this shall be full authority for any contract and any purchase made by the state purchasing department."

Section 82-1905, as amended in 1961, provides:

*"Payment for purchases by state agent.* All valid claims on account of such contract and purchases negotiated by the state purchasing agent shall be audited and paid from the sums severally set aside for the use of the state pur-

chasing department by the contract and purchase estimate or requisition."

Section 82-1906, as amended in 1961, provides:

*"Contracts for printing and supplies.* The state purchasing agent shall have exclusive power to contract for all printing and to purchase, sell, or otherwise dispose of, or to authorize, regulate and control the purchase, sale or other disposition of, all materials and supplies, service, equipment, and other physical property of every kind, required by any state institution or by any department of the state government; and to purchase or cause to be purchased all needed commissary supplies, and all raw material and tools necessary for any manufacturing carried on at any of said institutions; and to sell all manufactured articles, and collect the money for the same, and generally to regulate and control all purchases by any department of the state government, or by any state institution; and also to furnish, repair, and maintain the executive residence for the governor. The state purchasing agent shall remit to the state treasurer all moneys received from the sale of property belonging to the state of Montana, said moneys to be by the treasurer credited to the general fund."

In 1923, the Legislature enacted Chapter 66, Session Laws of 1923, and further provisions were added to Chapter 19 of Title 82, and as in effect at the time this cause arose, and so far as pertinent here, contain these enactments:

After providing that all persons in charge of any state property must, upon request, furnish the state purchasing agent with a sworn inventory thereof, section 82-1911, R.C.M.1947, and that such agency is accountable for such personal property section 82-1912, it provided in section 82-1913, as follows:

*"Advertising for bids required—low bidder to receive contract.* The state purchasing agent in making purchase of supplies and equipment under the provisions of this act,

or under the laws of the state of Montana must advertise as hereinafter provided, and award contracts in the name of the state of Montana for such supplies and equipment to the lowest responsible bidder, except as hereinafter provided."

It further provided under section 82-1915:

*"Contracts for supplies of state agencies.* Unless otherwise provided by law, the state purchasing agent shall have exclusive power, subject to the consent and approval of the governor, to let to the lowest bidders and enter into contracts with the lowest bidders, for the furnishing of all supplies, stationery, paper, fuel, water, lights, and other articles required by the legislative assembly and all other offices, departments, boards, commissions and institutions of the state.

"Before any such contract is let, the state purchasing agent must advertise in such manner and for such time as in this act provided for sealed proposals for all such supplies or services mentioned in this section."

Section 82-1916, as amended in 1961, dealt with printing and publications and provided that "The state purchasing agent shall have exclusive power, subject to the consent and approval of the governor, to contract for all printing for any purpose used by the state of Montana in any state office, elective or appointive or by any state board, commission, bureau, state institution or department except the printing of the decisions of the supreme court as provided in section 82-2004, Revised Codes of Montana, 1947, and shall supervise and attend to all public printing of the state of Montana in the manner in this act provided * * *."

Section 82-1917 provides for the requisitions for supplies and the manner of letting contracts and contains these provisions:

*"Requisitions for supplies—manner of letting contracts.* State officers, commissioners or boards, or departments,

superintendents of state institutions or departments shall tabulate in detail the amount of supplies on hand for any class of merchandise for such period as determined by the state purchasing agent, and the additional supplies needed for a period of time not to exceed one year's supply. The state purchasing agent shall make examination of the amount of supplies on hand and shall determine from such examination and from the statements so furnished him, as in this section provided, the additional amount of supplies necessary and shall make an itemized statement thereof, all of which acts of said state purchasing agent shall be subject to approval of the governor. As soon as the state purchasing agent shall determine, as in this section provided, what kind of supplies and the amount necessary for the state of Montana to purchase for its state offices, boards, commissions, departments or institutions, he shall make such purchases.

"All purchases by the state purchasing agent shall be based on competitive bids. On any purchase where the estimated expenditure shall be two thousand dollars ($2,000.00) or over, sealed bids shall be solicited by mail from each person, firm or corporation who has filed with the state purchasing agent a request in writing that it be listed for solicitation on bids for such particular items set forth in such listing: provided, that if any person, firm or corporation whose name is listed shall fail to respond to any solicitation for bids, after the receipt of three such solicitations, such listing shall, within the discretion of the state purchasing agent, be cancelled: provided, further, that it shall be within the discretion of the state purchasing agent to advertise for such purchases. * * *

"The state officers, superintendents, commissioners, departments or institutions, shall not have the authority to purchase any supplies or material, except on approval of the state purchasing agent."

Section 82-1919, as amended in 1961, provides in the first paragraph for the purchase of fresh fruits and vegetables and the second paragraph reads:

"Likewise, when immediate delivery of articles or performance of service is required by the public exigencies, the articles or service so required may be procured by open purchase or contract at the place and in the manner in which such articles are usually bought and sold or such services engaged between individuals, but under the direction of the state purchasing agent."

Section 82-1920 requires impartiality in awarding contracts, section 82-1921 for a record of all bids, and section 82-1922 prohibits transfer of any interest in a contract or order.

These appear to encompass all the statutory enactments which are pertinent in this cause.

We therefore note that the exclusive authority to purchase or to direct the purchase of supplies and equipment required by agencies of the state is given to the state purchasing agent under section 82-1902 and section 82-1906, supra. Such procurements are to be accomplished through the solicitation of competitive bids (section 82-1913) except (a) purchase of fresh fruits and vegetables, and (b) articles, the immediate delivery of which are required by "the public exigencies" (section 82-1919) subject to the manner of operation provided in section 82-1917.

In brief, such procurement procedure would be that the state agency submits to the state purchasing agent an estimate or requisition (section 82-1904); such estimate or requisition is examined by the state purchasing agent, evaluated by him, and, subject to the approval of the Governor, he determines what equipment and supplies are required (paragraph 1, § 82-1917); he then solicits by mail sealed bids from suppliers who have previously requested that they be included on the roster of potential suppliers for the state; if the purchase is estimated to

exceed $2,000 he may advertise for bids (paragraphs 2, 3 of § 82-1917).

The bids are opened in public at the time set in the solicitations and, unless all bids are rejected, the contract is awarded to the lowest responsible bidder; if all bids are rejected, another solicitation for bids may be made, or the purchasing agent may, with the approval of the Governor, purchase the needed supplies "on the open market if they can be so purchased at a better price." (R.C.M.1947, § 82-1917, paragraph 5.)

All "contracts for supplies for any purpose authorized by law shall be made by the state purchasing department in the name of the state of Montana." (R.C.M.1947, § 82-1921.)

The contract price is paid by the state purchasing department from funds earmarked and set aside for that purpose by the state agency which submitted the purchase estimate or requisition to the state purchasing department for approval by purchasing agent. (R.C.M.1947, § 82-1905, as amended in 1961.)

In Miller Ins. Agency v. Porter, 93 Mont. 567, 573, 20 P.2d 643, 645, the question of whether fire insurance policies were "supplies" was before this court. In disposing of that question this court stated:

"Counsel for plaintiff assert that the board of examiners was not authorized to let contracts for fire insurance unless it first advertised for proposals pursuant to the provisions of sections 256 and 257, Revised Codes of 1921. Counsel for both parties, both in oral argument and in their briefs, assert that the necessity for advertising turns solely upon the question of whether or not fire insurance comes within the meaning of the term 'supplies.' The plaintiff asserts that fire insurance is included within the term, and the defendants assert the contrary. Neither party to this appeal questions the authority of the board to secure fire insurance policies on state buildings. * * *

"The term 'supplies' has not been held to include every thing that is furnished to the state or a municipality. In the case of White v. Moore, 288 Pa. 411, 136 A. 218, coal for the use of a schoolhouse was held not to be included within the expression 'school supplies.' Again, in the case of Milwaukee Electric Railway [& Light] Co. v. City of Milwaukee, 173 Wis. 329, 181 N.W. 298, electric current furnished to the city was held not to be included within the term 'supplies,' in the statute requiring a contract that all supplies should be let after bids or proposals were received. In the case of Gleason v. Dalton, 28 App.Div. 555, 51 N.Y.S. 337, 338, it was proposed to secure an additional supply of water for the city of New York, and it was urged that it could only be obtained after the advertising for bids under a statute requiring such procedure. The court in its decision said: 'It may be conceded that in a broad etymological sense the word "supply" embraces anything which may be furnished to meet the need of any particular department of the city or its inhabitants. And yet it is manifest that the use of such word in public charters was not intended to be construed in terms as broad as its etymological sense, and has been many times made to yield to incompatible conditions. Indeed, its enforcement at all times would fail in accomplishment of the purpose for which it was created'."

There exist many cases in other jurisdictions distinguishing or defining materials, equipment, supplies, tools and appliances. Typical is United States Fid. & Guar. Co. v. E. I. DuPont & Co., 197 Wash. 569, 85 P.2d 1085, wherein the court states:

"In United States Rubber Co. [of Cal.] v. American Bonding Co., 86 Wash. 180, 149 P. 706, L.R.A. 1915F, 951, we said: 'To distinguish between materials and equipment is comparatively easy, since the term "materials," as we have defined the term in Gate City Lumber Co. v. Montesano, 60 Wash. 586, 111 P. 799, includes such articles only as enter

into and form a part of the finished structure, or, it may be, such articles as are capable of being so used and are furnished for that purpose, while "equipment" is, what the word imports, the outfit necessary to enable the contractor to perform the agreed service, the tools, implements, and appliances which might have been previously used or might be subsequently used by the contractor in carrying on other work of like character.'

"In National Surety Co. v. Bratnober Lumber Co., 67 Wash. 601, 122 P. 337, we said [page 343] ; 'It seems to us that the words "provisions" and "supplies" include anything that is furnished for, and used directly in the carrying on of, the work, and is entirely consumed thereby. Such things do not enter into and become a physical part of the finished structure like "materials" do, as that word is generally construed; but they do become as much a part of the structure as the labor which is performed upon it.'

"The test of whether a given thing constitutes a supply or equipment is whether the article forms a part of the finished structure; and in addition, if, although such things do not become a physical part of the finished product, structure, or improvement, they are entirely consumed in the course of the construction they are supplies and not equipment."

Voting machines are held not to be supplies in Kingsley v. City and County of Denver, 126 Colo. 194, 247 P.2d 805, in this language:

"Again, it is urged that the contract authorized by ordinance was invalid in that it was let without approval of the Commissioner of Supplies, in opposition to the advice of the Mayor and contrary to the recommendation of the Election Commission. Voting machines are not supplies; consequently, the approval of the Commissioner of Supplies is not necessary. Eggart v. Westmark, Fla., 45 So.2d 505;

Automatic Voting Machine Co. v. Board of Chosen Free-holders of Bergen County, 120 N.J.L. 264, 199 A. 375."

█ These cases are of little aid in consideration of this cause. While it is readily apparent that there exists in our statutes variations in the descriptions of the articles to be purchased by the state purchasing agent it appears to us that it was clearly the intent of the Legislature in providing for a state purchasing agent and defining his duties to include supplies, materials, service, equipment, tools, and all physical property of every kind required by all offices, departments, boards, commissions and institutions of the State of Montana. He has the sole purchasing power, to be exercised in the manner provided by law.

Defendants state in their brief:

"On January 25, 1962, the Governor of the State of Montana, the Secretary of Agriculture of the State of Montana and the Governor's Executive Secretary, together with three highly experienced members of the Montana Air National Guard lost their lives when the antiquated DC-3 aircraft in which they were flying came apart in the air and crashed into a mountain side north of Helena. Thereupon, by operation of law, the Lieutenant Governor succeeded to the office of Governor of the State of Montana.

"On February 14, 1962, the Montana Aeronautics Commission met and considered the problem of providing safe transportation for the new Governor of the State. As a result of this discussion, the Commission unanimously voted to secure a twin engine aircraft of sufficient capabilities to furnish safe and adequate transportation for the Governor, as well as for the Aeronautics Commission. The Director of the Commission was instructed to complete negotiations on a twin engine model 65 Queen Air aircraft.

"On February 16, 1962, the Director of the Aeronautics Commission, on behalf of the Commission, formally requested approval from the Board of Examiners of the

lease agreement which is the subject of this action. The Board of Examiners unanimously granted this approval on February 19, 1962, and on the next day, an order for the lease of the aircraft was issued by the State Controller's Office. The foregoing transpired less than one month after the tragic death of the former Governor, Donald G. Nutter. Thus did the State of Montana act swiftly to safeguard the life of its new Governor."

It is further argued that these facts disclose that immediate delivery of the airplane was required by the public exigencies referred to in section 82-1919, supra, and that even if the lease be held to be a contract of purchase that it was a permitted emergency purchase.

It is suggested that this court should take judicial notice of the fact that on January 25, 1962, the Governor, his executive secretary, the secretary of agriculture, and three members of the Montana Air National Guard lost their lives in an airplane accident.

Under section 93-501-1, R.C.M.1947, we can take judicial notice of the fact that Governor Tim Babcock succeeded to the office of Governor of this state upon the death of Governor Donald G. Nutter. It requires no citation of authority, in view of our numerous rulings to that effect, that the matters enumerated in section 93-501-1 of which the courts may take judicial notice cannot be enlarged or diminished by judicial construction. The matters alluded to in their brief and upon oral argument could well constitute a defense herein but at this stage of the proceeding with neither pleading nor evidence on behalf of the defendants it is not before us.

But we have previously alluded to the fact that the State Board of Examiners unanimously approved of the expenditure, and no question has been raised in this case with respect to their constitutional power under Article VII, § 20, to examine and approve all claims against the State. This action, we must assume, was properly and regularly done in

contemplation of the exceptions to bidding noted heretofore. The portion of brief of counsel, hereinbefore quoted, and. considerable other material in the briefs, outside the record and of which we have been asked to take judicial notice and, as indicated, this we may not do. However, it does cause us much concern in that our entire decision and discussion may be for naught since the admitted situation existing at the time of the lease or purchase was such that a public exigency of the type in the minds of the Legislature must surely have existed, at least in the minds of the members of the State Board of Examiners. If this be true, barring fraud, bad faith or other matters not pleaded and before us, it seems likely that the matter may be moot; and it is well within the realm of probability that this factor influenced and dictated to the district judge that he should, as he did, deny injunctive relief by his order of dismissal.

Be that as it may, at this stage of this proceeding we cannot disregard what to us appears to be a proper interpretation of our laws and we must uphold them.

The order denying the application and dismissing plaintiff's amended complaint is reversed, set aside and annulled, and this cause is remanded to the district court for further proceedings not inconsistent with this opinion.

MR. JUSTICES CASTLES, JOHN CONWAY HARRISON and DOYLE concur.

ON PETITION FOR REHEARING.

MR. CHIEF JUSTICE JAMES T. HARRISON:

In this cause both appellant and respondents have filed petitions for rehearing, it being contended that our decision is either in conflict with an express statute or controlling decision to which the attention of the court was not directed, or that material facts were overlooked by the court.

We shall first discuss the contentions raised by the re-

spondents. It is their assertion that under subdivision 3 of section 93-501-1, R.C.M.1947, we should take judicial notice of a proclamation issued by the Honorable Tim M. Babcock, Governor of Montana, dated January 26, 1962, wherein it is noted that in the crash of a National Guard aircraft on January 25, 1962, six Montana citizens lost their lives, one of whom was the Honorable Donald G. Nutter, Governor of the State of Montana. That, secondly, we should take judicial notice of a letter written by Charles Lynch, Director, Montana Aeronautics Commission, on February 16, 1962, to the State Board of Examiners, wherein it is stated that the Commission wished to lease a Beech Craft 65 Queenaire Aircraft and calls attention to the death of the Governor in the tragic airplane accident as illustrating the long-standing need for safe and adequate transportation of the Governor and other officials of the state; that such aircraft would not only be used in the work of the Commission but would be available as executive transportation for the Governor and others approved and designated. This letter was unanimously approved by the State Board of Examiners on February 19, 1962. Enclosed with the letter were the proposed lease agreement and related documents, including requisition forms.

The aircraft lease was annexed to the amended complaint as Exhibit A and the purchase order as Exhibit B. None of the other documents aforementioned were before the district court, nor contained in the transcript on appeal filed in this cause.

We are cited authorities to the effect that since under the statute courts can take judicial notice of the official acts of the executive department of the state, we can take judicial notice of the action taken pursuant to the letter of the Aeronautics Commission and that from the contents thereof and the proclamation of the Governor it is clear that a public exigency existed. In our opinion herein we commented upon our concern that the statements of counsel dehors the record, now further fortified by tendered exhibits dehors the record, as mentioned

above, would disclose that a public exigency existed, and in reliance thereon the State Board of Examiners unanimously gave their approval to an emergency purchase, since under the present law it is only on purchases of an emergency nature that their approval is required.

Be that as it may, as we previously stated, neither this court nor the district courts should be required to assume the burden of informing themselves under the doctrine of judicial notice of facts not within the actual knowledge of the court. We think in this area there is a difference between judicial knowledge and actual knowledge and that the burden resting upon a litigant to present his proof cannot be shifted to the court under the doctrine of judicial notice.

In 20 Am.Jur., Evidence, § 27, p. 55, appears this pertinent statement:

"An appellate court will take judicial notice of any matter of which the court of original jurisdiction may take notice; but it cannot, when sitting in review, judicially notice matters which the original court could not have noticed. In the event a party relies on the judicial knowledge of the trial judge as to local conditions, he must in some form procure that knowledge to be brought into the record, so that an appellate court may rely thereupon, for the general rule is that if the attention of the trial court is not called to a fact within its judicial knowledge and such fact is not judicially noticed, the appellate court will not take judicial notice of it."

Such a situation prevails here, the documents here presented were never before the district court.

Again from Section 21 of Evidence, appearing on page 52 of 20 Am.Jur., we quote:

"Judicial notice in any particular case is not determined or limited by the actual knowledge of the individual judge or court. There is a basic distinction between judicial notice and judicial knowledge. In those instances where a

judge is personally conversant with a fact which is judicially cognizable, proof thereof is not required. It is not essential, however, that matters of judicial cognizance be actually known to the judge. If they are proper subjects of judicial knowledge, the judge may inform himself in any way which may seem best to his discretion and act accordingly. On the other hand, facts which are not judicially cognizable must be proved, even though known to the judge or to the court as an individual. In other words, the individual and extrajudicial knowledge on the part of a judge will not dispense with proof of facts not judicially cognizable, and cannot be resorted to for the purpose of supplementing the record."

There is an annotation upon Judicial Notice—Judicial Knowledge in 113 A.L.R., and we quote pertinent portions beginning on page 259:

"The court may, if it wishes, exercise a judicial knowledge sua sponte and without suggestion by counsel. Brown v. Piper (1875), 91 U.S. 37, 23 L.Ed. 200. And see Vahlc v. Brackenseik (1893), 145 Ill. 231, 34 N.E. 524, in which the court said: 'The court of its own motion will advise itself, so as to verify matter of which it is required to take judicial notice.'

"This does not mean, however, that it is not incumbent upon the party desiring the benefit of a fact of which the court may take judicial notice to bring the matter to the attention of the trial court in some manner. Good practice would seem to require this.

"As stated by Wigmore: 'Judicial notice being a dispensation of one party from producing evidence, it would seem that the party must, in point of form, make a request for it.' 5 Wigmore, Ev.2d ed., § 2568.

"So, it was stated in Walton v. Stafford (1897), 14 App. Div. 310, 43 N.Y.S. 1049 (affirmed in (1900) 162 N.Y. 558, 57 N.E. 92): 'The court is not invariably bound, sua

sponte, to take judicial notice of whatever ought to be generally known. Attention must first be called to the fact, and even then, the party asking the court to take judicial notice thereof must, at the judge's request, furnish the proper books or documentary evidence wherewith to refresh his recollection. Where the memory of the judge is at fault, he may refuse to take judicial notice of the fact, unless such books or documentary evidence are produced.' See also People ex rel. McCallister v. Keokuk & H. Bridge Co. (1919), 287 Ill. 246, 122 N.E. 467.

\* \* \* \* \* \* \* \* \*

"And the court in South Ottawa v. Perkins (1876), 94 U.S. 260, 24 L.Ed. 154, recognized that while the court of a state will take judicial notice of entries in the journal of the state legislature, 'the courts of Illinois may decline to take that trouble, unless parties bring the matter to their attention.'

"It was stated by Justice Holmes in Quong Wing v. Kirkendall (1912), 223 U.S. 59, 56 L.Ed. 350, 32 S.Ct. 192: 'There are many things that courts would notice if brought before them that beforehand they do not know. It rests with counsel to take the proper steps, and if they deliberately omit them, we do not feel called upon to institute inquiries on our own account.' \* \* \*

"With respect to facts, as distinguished from laws, the weight of authority supports the view that judicial notice will not be taken on appeal of a fact within the judicial knowledge of the court, which was not called to the attention of the trial court and was not judicially noticed by it. See the note in Ann.Cas. 1914B, 196; 1 Jones, Ev.2d.ed., § 474. And see 15 R.C.L., Judicial Notice, § 6.

" 'The explanation is that facts susceptible of notice are nevertheless matters of evidence and an appellate tribunal can only review evidence considered by the court below.' 1 Jones Ev.2d.ed., § 474.

376

"Thus, in Christy v. Wabash R. Co. (1916), 195 Mo.App. 232, 191 S.W. 241 (writ of error dismissed in (1916) 246 U.S. 656, 62 L.Ed. 924, 38 S.Ct. 424), holding that the appellate court would not take judicial notice of action taken by the Interstate Commerce Commission, where the matter was not referred to at the trial nor mentioned in brief or on argument at the original submission of the cause in the appellate court, it was stated: 'From motives of necessity, as well as of public policy, courts take judicial notice of general or public law, and their judgments must be supported by such laws, whether called to their attention or not. So there are many classes of things of which the courts take judicial notice, or have judicial knowledge. Some of these are so self-evident as to be ever present in the mind so that they naturally enter into a decision of any point to which they have application; as, for instance, knowledge of the order of succeeding days of the week, or months or seasons of the year, of the familiar laws of nature, etc. But there are other things which, from motives of policy, the law requires a court to judicially notice, or have knowledge of, but of which, in reality, it is ignorant. It is the duty of a litigant desiring the advantage of that knowledge, to suggest it to the court and to assist the court in examining at the proper sources for actual information * * *. The present instance is an apt illustration of the wisdom of the rule requiring the litigant to invoke the court's judicial knowledge. A particular order made by the Interstate Railroad Commissioners is not a thing which a court could reasonably know unless its attention was called thereto, and possibly, the means afforded, if required, for the court to ascertain whether such order in fact existed. But in addition to this, these orders, as we have said, were never mentioned in the trial court, nor were they referred to in this court, and to bring them into the case at this late day would violate the rule in this state

that a case must be determined, on appeal, on the same theory presented in the trial court'."

The opinion of this court, in Kibble v. Morris, 101 Mont. 308, 53 P.2d 1150, comments upon the necessity of furnishing proof of matters which can be judicially noticed in these words:

"It is urged that this court will judicially notice the public and official acts of the executive departments of the United States pursuant to the provisions of subdivision 3 of section 10532, Revised Codes 1921 [now R.C.M.1947, § 93-501-1]. If the original document had been produced in court, the trial judge under this section would have been bound judicially to notice the document and it would have been admissible, or if a copy of the document certified by its legal custodian had been offered, it likewise would have been admissible under subdivision 9 of section 10568 [now R.C.M.1947, § 93-1001-30]. As plaintiff failed to comply with either of these methods of proof, as provided by statute, the trial court properly excluded the offered exhibit."

Based upon these authorities we believe that our ruling as expressed in our opinion is correct and we adhere to it.

Having disposed of respondents' contention we now turn to those of the appellant.

■ Appellant contends that the court overlooked certain facts with respect to narrowing the issues, insisting that he never did question the acquisition of an airplane by the Commission but only acquisition of an airplane for the use of the Governor. Counsel vigorously argue that we have arrived at an erroneous conclusion in this respect. It is to be noted that the district judge apparently arrived at the same erroneous conclusion because in his opinion he stated:

"The Court therefore is of the opinion that the contract is one of lease rather than one of purchase. However, for the purpose of the several motions before the Court, the question will be considered from the standpoint of either

lease or purchase. *We go therefore to the first question involved, namely: whether under the law the Commission had the authority to acquire this aircraft in the manner alleged and use aviation funds to pay for it whether lease or purchase."* (Emphasis ours.)

And again this statement:

"Considerable has been said by counsel in briefs and oral arguments concerning the use by the Governor of the State of Montana, his staff and family, of the aircraft in question, the plaintiff contending that such uses (except perhaps in a limited degree as to the Governor for purely official business) are a violation of law and should be enjoined. The defendants contend that as the Governor obviously needs air transportation in a state as large as Montana, it is the duty of this state and the defendant commission to furnish such transportation and the facilities therefor.

"While the complaint alleges that the Governor and others are making use of the aircraft and that such use and the expenditure of state aviation funds for such use are illegal, (since the *two questions or issues involved here are the authority of the defendant commission to acquire the plane and to use such funds in its acquisition and the further question of necessity for advertising for bids,)* it *would appear that the actual use, or uses, to which the defendants or any of them put this aircraft are not here involved* and need not be considered in passing upon the motions now before the Court, for dismissal of plaintiff's amended complaint for failure to state a claim on which relief can be granted, and that it being determined that the commission has the authority to acquire the aircraft and to use state aviation funds in its acquisition and to do so without competitive bidding, any use to which any of the defendants may put the aircraft are, if claimed to be illegal, to be proceeded against in some other manner; ac-

cordingly the several motions to dismiss are granted."
(Emphasis ours.)

Rather clearly it appears to us, the judge presiding, who made the ruling from which this appeal was taken, interpreted the order limiting the issues the same as we have.

However, appellant insists that the question involved is that the Aeronautics Commission did not have power to expend its funds for the purpose of acquiring an airplane for the use of the Governor. If this be true it brings into sharp focus the discussion in our opinion with respect to the right of the appellant to maintain the action, first because he has suffered no irreparable injury, and second because he is not an interested party.

Since appellant now admits that the Aeronautics Commission may purchase an airplane what irreparable injury can he suffer by the purchase of one? Quite obviously, none. Suffering no injury where does his interest arise to maintain this suit?

His only interest as set forth in his complaint is that of a citizen, resident, property owner, taxpayer, owner and operator of an airplane and, as such, purchaser and user of gasoline upon which is collected the state license tax of which one cent per gallon is placed in the state aviation fund.

In Chovanak v. Matthews, 120 Mont. 520, 188 P.2d 582, we stated:

"The interest shown by appellant is only his interest as a citizen, elector, taxpayer and resident of Lewis and Clark County. This is the same interest that the other citizens, electors, taxpayers, and residents of the county have in the matter, and it is not such interest as is permitted to invoke the exercise of the judicial power of determining whether an act of the legislature is violative of the constitution.

"It is held in Montana, as it is held by the United States Supreme Court, and by courts throughout the nation, that

a showing only of such interest in the subject of the suit as the public generally has is not sufficient to warrant the exercise of judicial power. [Citing cases.] "

We quoted extensively from State ex rel. Mitchell v. District Court, 128 Mont. 325, 275 P.2d 642, in our opinion and we repeat this portion: " '*As a general rule, private citizens may not restrain official acts when they fail to allege and prove damage to themselves different in character from that sustained by the public generally.*' [28 Am.Jur. (1940) Injunctions]" (Emphasis ours.)

What damage has appellant suffered which differs from that of the public generally? Every person purchasing aviation gasoline pays the additional one cent tax, it will be neither raised nor lowered by the outcome of this suit, whatever it might be. The only complaint a taxpayer can have is when it affects his pocketbook by unlawfully increasing his taxes. Appellant here does not allege any particular injury which he personally would suffer.

It is quite clear from the appellant's petition for rehearing here that his only purpose in bringing this injunction action is to attempt to stop the Governor from using the airplane. In his complaint he did not pray for any such relief, but he now wants to litigate this issue which in our opinion we stated could not be done because he is not a proper person to maintain such an action, and thus by his own contentions he brings himself within the restrictions laid down in our opinion and the previous decisions of this court. The courts of Montana are not about to invade, at the request of citizens or taxpayers without further interest, the domains of other departments of state government to determine whether or not the use of state-owned property meets with our approval. The Constitution of this state has provided an Attorney General for that purpose, as we pointed out in our opinion, and as noted by the trial judge.

The petitions for rehearing are denied.

MR. JUSTICES CASTLES, JOHN CONWAY HARRISON and DOYLE concur.